Antonio PASSAMANO, Petitioner,

v.

TRAVELERS INDEMNITY COMPANY, an Illinois corporation; National Car Rental Systems, Inc., a Delaware corporation; and North–West Leasing Corporation, a Colorado corporation, Respondents.

Cecil KENT and Chuck Brown, Petitioners,

v.

BUDGET RENT–A–CAR SYSTEMS, INC., Respondent.

Nos. 92SC80, 92SC155.

Supreme Court of Colorado, En Banc.

Oct. 11, 1994.

gate for claims of intentional or negligent infliction of emotional distress.

Fish & Coles, D. Bruce Coles, Denver, for petitioner in No. 92SC80.

Montgomery, Green, Jarvis, Kolodny & Markusson, John T. Van Voorhis, Denver, for respondents in No. 92SC80.

Wilcox & Ogden, Ralph Ogden, Denver, for petitioners in No. 92SC155.

Burg & Eldredge, P.C., Matthew R. Giacomini, Scott J. Eldredge, John A. Scruggs, Denver, for respondent in No. 92SC155.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *Passamano v. Travelers Indemnity Co., National Car Rental Systems, and North–West Leasing Corp.*, 835 P.2d 514 (Colo.App. 1991), the Colorado Court of Appeals affirmed the trial court's summary judgment in favor of the respondents, Travelers Indemnity Company (Travelers), National Car Rental Systems (National), and North–West Leasing Corporation (North–West), and against the petitioner, Antonio Passamano (Passamano). Passamano filed a civil action seeking reformation of an agreement between North–West and Passamano to require the respondents to provide liability insurance coverage for injuries Passamano sustained when a car he rented from North–West collided with a vehicle driven by an uninsured motorist. The trial court concluded that the agreement did not constitute a contract of insurance for purposes of the provisions of section 10–4–

609(1), 4A C.R.S. (1994),[1] permitting a named insured of an automobile liability insurance policy to reject uninsured and underinsured motorist coverage.

In *Kent v. Budget Rent–A–Car Systems, Inc.*, the trial court entered a summary judgment against petitioners, Cecil Kent and Chuck Brown, and in favor of respondent, Budget Rent–A–Car Systems (Budget). Kent and Brown filed a civil action seeking reformation of an agreement between Budget and Kent by requiring Budget to provide uninsured motorist coverage for injuries the petitioners received in an accident involving a car rented to Kent by Budget and a vehicle driven by an uninsured motorist. The trial court apparently adopted Budget's argument that as a self-insurer it was not required to offer uninsured motorist coverage. Kent and Brown appealed the trial court's order to the court of appeals and also filed a petition with this court for certiorari review before judgment, pursuant to C.A.R. 50. Having granted both petitions, we reverse the judgment of the court of appeals in *Passamano* and the judgment of the trial court in *Kent*.[2]

## I

### A

On March 9, 1987, Passamano rented an automobile in Vail, Colorado, from North–West, a National licensee, pursuant to an agreement containing several options with respect to insurance coverage. At the time, North–West was a party to a liability insurance policy issued by Travelers covering North–West's vehicles. When purchasing the Travelers policy in effect at the time Passamano was injured, North–West rejected uninsured motorist coverage.

Prior to executing the agreement on March 9, 1987, Passamano and North–West's agent discussed the type of vehicle to be rented and the terms of the agreement, including provisions permitting purchase of "personal accident insurance" and a "collision damage waiver."[3] Passamano elected to purchase the collision damage waiver and elected not to purchase personal accident insurance. There was no discussion of uninsured motorist coverage.

The agreement contains the following relevant provisions pertaining to liability insurance:

### 5. LIABILITY INSURANCE

Authorized Driver is covered by an automobile liability insurance policy or qualified self-insurance arrangements, on a primary basis in respect to other insurance, for bodily injury or death (limits $100,000 each person, $300,000 each accident) and for property damage (limit $25,000) for each accident arising from use of Vehicle as permitted by this Agreement. Minimum Mandatory No Fault coverage as required by applicable law, is also provided. Company will not provide "Uninsured Motorist" coverage, "Underinsured Motorist" coverage or supplementary "No Fault" unless such coverages are required to be provided by applicable law and cannot be rejected. If required, and not rejectable,

1. Section 10–4–609(1) provides as follows:

 **Insurance protection against uninsured motorists.** (1) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 42–7–103(2), C.R.S., under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting

 therefrom; except that the named insured may reject such coverage in writing.
 § 10–4–609(1), 4A C.R.S. (1994).

2. We initially entered an opinion affirming the court of appeals' judgment in *Passamano* and the trial court's judgment in *Kent* on the ground that rental automobiles were not subject to the regulatory provisions of § 10–4–609(1). We subsequently granted petitions for rehearing filed by Passamano, Kent, and Brown to reconsider that conclusion.

3. According to Passamano's affidavit filed in opposition to North–West's summary judgment motion, with the exception of these two options, the rental agreement was offered on a "take it or leave it basis."

the limits will be the minimum required by law.

The Authorized Drivers will indemnify and hold harmless National Car Rental from and against all loss, liability and expense in excess of the limits of liability as indicated in this Agreement, as a result of bodily injury, death or property damage caused by, or arising out of, the use or operation of the rental Vehicle.

Authorized Drivers insured under the policy agree to comply with and be bound by all its terms, conditions, limitations and restrictions, which are made a part of the Agreement by reference. Evidence of this insurance is available for inspection at the Company's Home Office.

An Authorized Driver will immediately report any accident to the Company at the location where the Vehicle was rented and will also deliver to the Company at that location every summons, complaint or paper of any kind received by Authorized Driver in any way relating to an accident involving the Vehicle while rented under this Agreement. An Authorized Driver will not aid or encourage the filing of any claim as a result of any accident and will cooperate fully with the Company and its insurer in the investigation and defense of any claim or lawsuit. . . .

The agreement also contains the following provision pertaining to the option for obtaining a collision damage waiver:

(b) CDW—If you elect to accept and pay Collision Damage Waiver as indicated on Page 2 and Authorized Driver complies with all terms and conditions of this Agreement, you are relieved from liability for damages to Vehicle caused by collision. THIS COLLISION DAMAGE WAIVER IS NOT INSURANCE.

These provisions appear on the back side of the two-sided agreement and are printed in a small type-size. North–West agents did not furnish Passamano with a copy of the rental agreement prior to the initiation of negotiations concerning the renting of the vehicle.

While driving the car on March 10, 1987, near Leadville, Colorado, Passamano was involved in an accident caused by the negligence of an uninsured motorist. Passamano sustained serious injuries, including several broken bones and permanent loss of vision in his left eye; required lengthy hospitalization; and was absent from work for over six months. He subsequently filed suit against the respondents.

In his amended complaint, Passamano alleged that the agreement was in effect a contract of insurance; that with regard to such contract the defendants are in effect the insurer and he, Passamano, is the named insured; and that the defendants violated section 10–4–609(1) by failing to offer him uninsured motorist coverage. Passamano also alleged that Travelers was the insurer of North–West for the risk covered by the liability insurance provided to Passamano by the agreement; that North–West's rejection of uninsured motorist coverage under the Travelers policy violated public policy and the legislative intent in adopting section 10–4–609(1); that the agreement is unconscionable because it fails to state that North–West had rejected uninsured motorist coverage and because under the circumstances, including the format of the agreement and the conduct of North–West's agents, Passamano was not given a meaningful opportunity to read the entire agreement; and that the respondents' conduct was unconscionable in failing to offer Passamano an opportunity to purchase uninsured motorist coverage.

The defendants filed a motion for summary judgment. They argued that because North–West was the named insured under the contract of insurance executed by North–West and Travelers, only North–West had authority under section 10–4–609(1) to reject uninsured motorist coverage. The defendants also argued that the agreement between North–West and Passamano does not constitute a contract of insurance and that Colorado does not require a rental car agency to provide uninsured motorist coverage to its customers.

The trial court granted defendant's motion for summary judgment. Relying on this court's decision in *Davis v. M.L.G. Corpora-*

*tion,* 712 P.2d 985 (Colo.1986), the trial court determined that the agreement between Passamano and North–West is a bailment contract, not a contract of insurance. The trial court also determined that under the insurance policy issued to North–West by Travelers, North–West is the named insured and Passamano is an additional insured. The trial court concluded that Passamano had no authority to acquire or reject uninsured motorist coverage, and further concluded that the conduct of North–West and the terms and format of the rental agreement were not unconscionable.

On appeal, the court of appeals affirmed the trial court's summary judgment. The court of appeals concluded that in general an agreement for the lease of a vehicle from a car rental agency creates a bailment contract for the mutual benefit of the parties and that the language of the agreement executed by Passamano demonstrates that the agreement did not constitute a contract of insurance. *Passamano,* 835 P.2d at 515–16. The court of appeals agreed with the trial court that North–West was the named insured for purposes of the requirements of section 10–4–609(1) and that the rental agreement was not unconscionable.

B

On February 27, 1989, Kent rented an automobile from Budget in Denver, Colorado. The agreement contained the following relevant provisions:

6) **LIABILITY INSURANCE:** IF THERE IS NO VIOLATION OF ANY OF THE USE RESTRICTIONS IN PARAGRAPH 5 ABOVE, Renter and any Authorized Driver shall, while operating the Vehicle, be provided with liability coverage in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy or in accordance with the requirements of a qualified self-insurer instead of such coverage, for protection against liability for causing bodily injury (including death) and property damage with one of the following applicable coverage limits:

—coverage limits imposed by the state financial responsibility law where this rental transaction takes place; OR

—coverage limit of $100,000 for each person, but not more than $300,000 for each occurrence, and property damage limits of up to $25,000 for each occurrence if a Renter, at time of rental, possessed valid Budget CorpRate or Sears Checklist Charge credentials, and such rental is charged at a valid Budget CorpRate or Sears Checklist Charge rate.

—(If S.L.I. is offered and accepted, a higher limit of liability insurance will be provided as described in the applicable brochure[.])

A. All coverages automatically conform to the basic requirements of any "No–Fault" law which may be applicable. RENTER WAIVES UNINSURED AND UNDERINSURED MOTORIST, SUPPLEMENTAL NO–FAULT AND OTHER OPTIONAL COVERAGES.

B. If any coverages herein cannot be excluded or waived, Renter agrees that such coverages shall be automatically reduced to the minimum requirements of the applicable financial responsibility law and that such coverages shall be excess to any other applicable insurance....

Budget was self-insured and neither offered nor provided uninsured motorist coverage to Kent. The rental agreement did provide Kent with liability coverage of $100,000 per person and $300,000 per occurrence, as well as property damage coverage of $25,000.

While operating the car, Kent was forced off a road by the negligent conduct of an uninsured motorist who was driving a vehicle while under the influence of alcohol. As a result, Kent and Brown, a passenger in the car, sustained severe injuries. Kent and Brown subsequently filed a civil action against Budget in the District Court for the City and County of Denver. Their complaint requested damages, costs, and a declaratory judgment reforming the rental agreement to include uninsured motorist coverage of $100,000 per person and $300,000 per occurrence.

Budget filed a motion for summary judgment, asserting that as a self-insurer it was not required to provide uninsured motorist coverage to Kent. The trial court granted the motion and entered judgment for Budget and against Kent and Brown.

## II

Passamano, Kent, and Brown argue that the agreements they executed are in effect liability insurance policies or, alternatively, are agreements that include liability insurance policies. They argue that, in either event, section 10–4–609(1) requires lessor car rental companies to provide the option of purchasing uninsured motorist coverage to their lessees. We agree.

## A

■ In *Passamano*, the court of appeals concluded that the agreement executed by Passamano and North–West constituted a bailment contract. *Passamano*, 835 P.2d at 516. To the extent the agreement provides for the leasing of personalty on specified terms and conditions, we agree. *Davis*, 712 P.2d at 987–88; *Christensen v. Hoover*, 643 P.2d 525, 528–29 (Colo.1982). However, the agreement also contains several provisions describing particular automobile liability insurance coverages. In our view, those provisions constitute more than mere conditions of the bailment. North–West, as the owner of the vehicle, was required to provide certain minimum insurance coverage for personal injuries sustained by any user thereof. § 10–4–703(2), (6), (8), 4A C.R.S. (1994). It elected to do so by purchasing a policy of insurance from Travelers covering all North–West's vehicles. Under that contract North–West is the named insured and Passamano is an additional insured.

However, North–West also elected to offer Passamano several options with respect to amounts of coverage for particular losses.[4] The options were offered at specified rates. Section 10–1–102(7), 4A C.R.S. (1994), defines the term "insurance" for purposes of

the provisions of Title 10 respecting regulation of all forms of insurance as follows:

> "Insurance" means a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies, and includes annuities.

Section 10–1–102(8), 4A C.R.S. (1994), defines the term "insurer" for purposes of Title 10 as follows:

> "Insurer" means every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance.

By offering to sell Passamano various insurance coverages for specified prices, North–West was an insurer for purposes of section 10–4–609(1) with respect to its negotiations with Passamano. This view of the nature of the agreement between North–West and Passamano gives effect to its substance rather than to its form. *See Lorenzen v. Mustard's Last Stand, Inc.*, 196 Colo. 265, 267, 586 P.2d 12, 14 (1978).

■ The determination that North–West is an insurer for purposes of the provisions of section 10–4–609(1) requiring insurers to offer uninsured motorist coverage to potential insureds begins rather than ends the inquiry, however. We are aware that courts are divided on the question of whether lessor car rental agencies such as North–West, which are insured by a third party such as Travelers, must offer uninsured motorist coverage to their lessees. *Compare Moon v. Guarantee Ins. Co.*, 764 P.2d 1331 (Okla.1988) (lessor's business auto policy contained uninsured motorist coverage by operation of law, and only written rejection of same by "named insured," held to be the lessee, effected valid waiver of uninsured motorist coverage) *with Kohly v. Royal Indem. Co.*, 190 So.2d 819 (Fla.Dist.Ct.App.1966) (automobile rental agency was "named insured" and therefore authorized to reject uninsured motorist coverage); *Lapp v. Transport Indem. Co.*, 164 Cal.App.3d 161, 210 Cal.Rptr. 135 (1985) (truck lessor was named insured, and

---

4. It is unclear whether Passamano was informed that some of the "options" described in his agreement with North–West in fact constituted offers to purchase coverages in addition to coverage already provided by an existing insurance policy under which Passamano was an insured.

therefore authorized to reject uninsured motorist coverage, binding permissive user). The majority of courts that have addressed the issue have concluded that in such circumstances the lessor car rental agency is the named insured under the applicable insurance policy and is therefore the sole entity entitled to accept or reject uninsured motorist coverage. *See Lapp,* 210 Cal.Rptr. at 136. Under this view, the failure of a car rental agency to offer uninsured motorist coverage to a lessee who is an insured under an insurance policy previously purchased by the agency does not violate applicable legislation requiring insurers to provide such an option to named insureds.

Relying on *Lapp* and similar decisions, North–West and Travelers argue that Passamano was not a named insured under the Travelers policy and, therefore, was not authorized to exercise the option to purchase uninsured motorist coverage under that policy.

In our view, the statutory scheme adopted by the General Assembly with respect to automobile insurance policies in general and uninsured motorist coverage in particular compels a different conclusion.

We have determined that North–West was not only the named insured under its insurance policy with Travelers, but was also an insurer with respect to its rental agreement with Passamano. Thus the rental agreement constitutes an insurance policy for purposes of our statutes regulating automobile liability insurance policies.[5] As the named "Authorized Driver" of the rented automobile in the rental agreement, Passamano was the "named insured" thereunder for purposes of section 10–4–609(1) and was entitled to acquire or reject uninsured motorist coverage.

North–West and Travelers contend that the rental agreement executed by Passamano

is not subject to the requirements of section 10–4–609(1). Section 10–4–601 defines the term "policy" for the purposes of part 6 in pertinent part as follows:

> **Definitions.** As used in this part 6, unless the context otherwise requires:
>
> . . . .
>
> (2) "Policy" means an automobile insurance policy providing coverage for all or any of the following coverages: Collision, comprehensive, bodily injury liability, property damage liability, medical payments, and uninsured motorist coverage, or a combination automobile policy providing bodily injury liability, property damage liability, medical payments, uninsured motorist, and physical damage coverage, delivered or issued for delivery in this state, insuring a single individual, or husband and wife, or family members residing in the same household, as named insured, and under which the insured vehicles therein designated are of the following types only:
>
> (a) A motor vehicle of the private passenger or station wagon type that is not used as a public or livery conveyance for passengers nor rented to others....

§ 10–4–601, 4A C.R.S. (1994). North–West and Travelers argue that this language reflects the General Assembly's intent to exempt liability insurance policies covering rental vehicles from the provisions of section 10–4–609(1) requiring insurers to offer their customers the option of purchasing uninsured motorist coverage.[6] We disagree.

In construing a statute we must give full effect to the legislative intent. *People v. Schuett,* 833 P.2d 44, 47 (Colo.1992); *Snyder Oil Co. v. Embree,* 862 P.2d 259, 266 (Colo. 1993). We endeavor to ascertain that intent from consideration of the language of the statute. *Farmers Ins. Group v. Williams,*

---

**5.** Travelers and North–West suggest that because the rental agreement in question is a collision damage waiver and "personal accident insurance," which are first party coverages, it is not a policy of automobile or motor vehicle liability insurance for purposes of § 10–4–609. We disagree. The statutory provisions regulating automobile liability provisions may not be construed in isolation from statutes regulating first-party coverages.

**6.** Section 10–4–608 provides: "This part 6 shall not apply ... to any policy insuring more than four automobiles...." While the policy issued by Travelers to North–West may be presumed to cover more than four vehicles, the policy under scrutiny here—the rental agreement between North–West and Passamano—covers only one vehicle. Thus the exemption created by § 10–4–608 is irrelevant.

805 P.2d 419, 422 (Colo.1991). However, if relevant statutory language is ambiguous, we must adopt other means of determining the legislative intent. § 2–4–203, 1B C.R.S. (1980). An examination of relevant legislative history frequently proves most beneficial in ascertaining the intent of the General Assembly. *General Elec. Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994); *Charnes v. Boom,* 766 P.2d 665, 667 (Colo.1988).

In this case, we must give full effect to the language of the General Assembly requiring all insurers to offer uninsured motorist coverage, as set forth in section 10–4–609, as well as the definitional provisions of section 10–4–601(2). However, we must also consider the introductory language to the definitional provisions of section 10–4–601, which provides that in some contexts the definitions contained therein, including the definition of the term "policy," might not be applicable.

We thus consider the legislative history of these nine sections to ascertain whether in context the broad language of section 10–4–609 is limited by the definition of "policy" contained in section 10–4–601.

In 1965, the General Assembly adopted House Bill 1116, entitled "AN ACT RELATING TO MOTOR VEHICLES AND PROVIDING FOR FINANCIAL RESPONSIBILITY IN CONNECTION WITH THE OWNERSHIP OF THE SAME." Act approved April 30, 1965, ch. 91, 1965 Colo.Sess. Laws 333–58. The first two sections of House Bill 1116 (hereafter sometimes referred to as "the uninsured motorist provisions") established the requirement that uninsured motorist coverage must be made available to purchasers of automobile liability insurance policies. The uninsured motorist provisions were codified at 1963 C.R.S. sections 72–12–19 and –20 (1965 Perm.Supp.), as amendments to article 12 of title 72, which article was entitled "Casualty, Fidelity, Surety and other Motor Vehicle Insurance—Rates and Rating Organizations."

The first section of House Bill 1116 contained the following language:

Section 1.—**Declaration of purpose.**—The general assembly is acutely aware of the toll in human suffering and loss of life, limb, and property caused by negligence in the operation of motor vehicles in our state. Although it recognizes that this basic problem can and is being dealt with by direct measures designed to protect our people from the ravages of irresponsible drivers, the general assembly is also very much concerned with the financial loss visited upon innocent traffic accident victims by negligent motorists who are financially irresponsible. In prescribing the sanctions and requirements of this act, it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.

Ch. 91, sec. 1, 1965 Colo.Sess.Laws 333. House Bill 1116 did not expressly provide for the codification of this "Declaration of purpose." The declaration of purpose was initially codified at 1963 C.R.S. section 72–12–20 (1965 Perm.Supp.), presumably by the reviser of statutes.

Section 2 of House Bill 1116 contained the following provisions:

Section 2. Article 12 of chapter 72, Colorado Revised Statutes 1963, is hereby amended BY THE ADDITION OF A NEW SECTION 72–12–19 to read:

72–12–19.—Insurance protection against uninsured motorists.—No automobile liability or motor vehicle liability policy, insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 13–7–3(11), C.R.S.1963, as amended, under provisions approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sick-

ness or disease, including death, resulting therefrom; provided, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage; and provided further, that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer.

H.B. 1116, Ch. 91, sec. 2, 1965 Colo.Sess. Laws 333–34. This section of House Bill 1116 was codified at 1963 C.R.S. section 72–12–19 (1965 Perm.Supp.).

The majority of the remaining sections of House Bill 1116 repealed numerous statutory provisions formerly codified in article 7 of chapter 13 of the Colorado Revised Statutes and reenacted those provisions as the "Motor Vehicle Financial Responsibility Act" (1965 Financial Responsibility Act). The 1965 Financial Responsibility Act contained a "Declaration of purpose" identical to the language of section 1 of House Bill 1116. 1963 C.R.S. § 13–7–2 (1965 Perm.Supp.). The language of the declaration of purpose contained in the 1965 Financial Responsibility Act has remained intact. § 42–7–102, 17 C.R.S. (1994 Supp.). *See* Ch. 337, sec. 1, § 42–7–102, 1994 Colo.Sess.Laws 2094, 2473.

In 1969, four years after the enactment of the uninsured motorists provisions and the 1965 Financial Responsibility Act, the General Assembly adopted "AN ACT CONCERNING THE REGULATION OF AUTOMOBILE INSURANCE POLICY CANCELLATION." Act approved July 1, 1969, ch. 192, secs. 1–10, 1969 Colo.Sess.Laws 549–51. Senate Bill 350 contained ten sections, the last two of which consisted of a safety clause and a provision establishing the effective date thereof. The eight substantive sections

of Senate Bill 350, which eight sections will hereafter be referred to as the "Cancellation Act," related exclusively to the regulation of procedures for the cancellation of automobile insurance policies and were initially codified at 1963 C.R.S. sections 72–30–1 to –8 (1969 Perm.Supp.).[7]

The prefatory language to the definitional sections of the Cancellation Act reflects the General Assembly's intent to limit the definitions contained therein to the eight substantive provisions thereof.[8] The broad declaration of policy contained in 1963 C.R.S. sections 72–12–19 and –20 (1965 Perm.Supp.), and repeated verbatim by section 2 of the 1965 Financial Responsibility Act, then codified at 1963 C.R.S. section 13–7–2, (1965 Perm.Supp.), was not affected by the adoption of the Cancellation Act. Thus as of July 1, 1969—the effective date of the Cancellation Act—the General Assembly had adopted two distinct statutory schemes. Former House Bill 1116, then codified at 1963 C.R.S. sections 72–12–19 and –20 (1965 Perm.Supp.), required that all purchasers of automobile liability insurance policies be offered the option of purchasing uninsured motorist coverage to effectuate the broad policy articulated in the declaration of policy set forth in 1963 C.R.S. section 72–12–20 (1965 Perm.Supp.) encouraging motorists to protect themselves against losses caused by the negligent conduct of financially irresponsible motorists. *See Kral v. American Hardware Mut. Ins. Co.*, 784 P.2d 759, 765 (Colo.1989). Former Senate Bill 350, then codified at 1963 C.R.S sections 72–30–1 to –8 (1969 Perm.Supp.), established criteria for cancellation of certain defined automobile insurance policies. The adoption of the Cancellation Act in 1969 did not undermine the intent or effect of the adoption in 1965 of House Bill 1116.

In 1973, pursuant to 1963 C.R.S. section 135–6–1 (1971 Perm.Supp.), the revisor of statutes completed a general recodification of

---

7. The parties have not suggested that the few minor amendments to portions of §§ 10–4–601 to –608 on various occasions since 1965 affect the substance of these provisions.

8. The prefatory language to the definitional sections of Senate Bill 350 referred to the definition "[a]s used in this Act." Act approved July 1, 1969, ch. 192, sec. 1, 1969 Colo.Sess.Laws 549.

As codified in title 72, article 30, the phrase was altered to state "[a]s used in this article." § 72–30–1, 1963 C.R.S. (1969 Perm.Supp.). The change in language did not alter the fact that the definitional provisions of the Cancellation Act did not in any way affect the broad sweep of the uninsured motorist provisions of House Bill 1116.

the Colorado Revised Statutes.[9] The uninsured motorist provisions originally contained in House Bill 1116 were recodified without change at sections 10–4–319 and –320, 4 C.R.S. (1973). The Cancellation Act was recodified without change at sections 10–4–601 to –608, 4 C.R.S. (1973). As in 1969, the limiting language of the definition of the term "policy", codified at section 10–4–601(2), 4 C.R.S. (1973), had no effect on the broad language of the uninsured motorist provisions then codified at sections 10–4–319 and –320, 4 C.R.S. (1973).

In 1979, the General Assembly repealed section 10–4–319, 4 C.R.S. (1973), requiring that purchasers of automobile liability insurance be offered the opportunity to purchase uninsured motorist coverage, originally adopted in 1965 as section 2 of House Bill 1116 and initially codified at 1963 C.R.S. § 72–12–19 (1965 Perm.Supp.). Ch. 69, sec. 7, 1979 Colo.Sess.Laws 360. Simultaneously, the identical language of former section 2 of House Bill 1116 was enacted as section 10–4–609, 4 C.R.S. (1973 & 1979 Supp.).[10] Ch. 69, sec. 11, § 10–4–609, 1979 Colo.Sess.Laws 377. The Cancellation Act remained codified at section 10–4–601 to –608, 4 C.R.S. (1973 & 1979 Supp.). The language of section 10–4–609, 4 C.R.S. (1973 & 1979 Supp.), remained directed exclusively to the requirement that purchasers of automobile liability insurance policies be offered the opportunity to purchase uninsured motorist coverage. That requirement furthered the declaration of purpose articulated in section 1 of House Bill 1116; it had no relationship to the purposes and requirements of the Cancellation Act first articulated in 1969 in Senate Bill 350

and recodified in 1973 at sections 10–4–601 to –608, 4 C.R.S. (1973).

It is also noteworthy that the eight sections comprising the Cancellation Act do not address the same subject matter as section 10–4–609, 4A C.R.S. (1994). The definitions and policies embodied in sections 10–4–601 to –608 are designed to protect private but not commercial consumers from unfair insurance policy termination procedures. They have no relevance to the uninsured motorist provision set forth in section 10–4–609.

In 1979, section 10–4–320, 4 C.R.S. (1973), containing the declaration of purpose initially adopted in 1965 as section 1 of House Bill 1116, was also repealed. Ch. 69, sec. 7, 1979 Colo.Sess.Laws 360. However, language identical to the declaration of purpose set forth initially in section 1 of House Bill 1116 was retained unaltered in section 42–7–102, 17 C.R.S. (1973). Thus in 1979 the General Assembly reaffirmed its continued commitment to the broad policy and specific requirements established in 1965 by the uninsured motorist provisions of House Bill 1116 as well as to the policies articulated and effectuated by the Cancellation Act.

 In our view, this examination of the history of the codification of the uninsured motorist provisions of House Bill 1116, the Cancellation Act, and the 1965 Financial Responsibility Act evidences an unflagging legislative intent to assure that motorists in this state are afforded an opportunity to protect themselves from losses resulting from the negligent conduct of financially irresponsible operators of motor vehicles.[11] A legislative intent to change the meaning of a statute in the course of a general revision will not be

---

9. "Colorado Revised Statutes 1973 was enacted as a repeal and reenactment of the Colorado Revised Statutes 1963 and the supplements thereto, as provided for in section 2–5–122." § 2–5–113(1), 1B C.R.S. (1994 Supp.). The revisor was authorized to make changes in arrangement and terminology which would improve the style and clarity of the laws, but was not to change the substance of any statute. § 2–5–103(2), 1B C.R.S. (1980).

10. This language is now codified at § 10–4–609, 4A C.R.S. (1994).

11. The General Assembly reaffirmed this policy with the passage in 1973 of the Colorado No

Fault Act, which statute provides in pertinent part as follows:

> The general assembly declares that its purpose in enacting this article is to avoid inadequate compensation to victims of automobile accidents; to require registrants of motor vehicles in this state to procure insurance covering legal liability arising out of ownership or use of such vehicles and also providing benefits to persons occupying such vehicles and to persons injured in accidents involving such vehicles.

Ch. 94, sec. 1, § 13–25–2, 1973 Colo.Sess.Laws 334.

inferred unless such an intention is required by express legislative language. *See Davis v. Conour,* 178 Colo. 376, 382, 497 P.2d 1015, 1018 (1972). No such intent was indicated by the General Assembly when it recodified section 2 of House Bill 1116 to section 10–4–609(1). To the contrary, the decision of the General Assembly in 1979 to retain the language of section 1 of House Bill 1116 verbatim in section 2 of the Motor Vehicle Financial Responsibility Act codified at section 42–7–102, 17 C.R.S. (1973), reflects the General Assembly's intent to perpetuate the broad policy articulated therein.[12]

For the foregoing reasons, we conclude that the definition of "policy" contained in section 10–4–601(2), 4A C.R.S. (1994), does not limit the intent of the General Assembly, first articulated in 1965, continually reaffirmed since then, and currently reflected by section 10–4–609, 4A C.R.S. (1994), and section 42–7–102, 17 C.R.S. (1993), that all purchasers of automobile liability insurance policies must be afforded the opportunity to purchase uninsured motorist coverage. We also conclude that the rental agreement offered by North–West and signed by Passamano constituted an automobile liability insurance policy for purposes of the provisions of section 10–4–609(1), 4A C.R.S. (1994), notwithstanding the provisions of section 10–4–601(2), 4A C.R.S. (1994), defining the term "policy" for purposes of sections 10–4–601 to –608, 4A C.R.S. (1994). We therefore reject the contrary determination reached by the court of appeals.

### B

Kent and Brown argue that the agreement executed by Budget and Kent constitutes a contract of insurance pursuant to which Kent is the named insured and Budget is the insurer. They contend that Budget, as the insurer, was required by section 10–4–609(1) to offer Kent the right to accept or reject uninsured motorist coverage.

We conclude that the agreement between Budget and Kent constitutes a contract of insurance for purposes of section 10–4–609(1) and that Budget was required to offer uninsured motorist coverage to Kent.

Both parties have pointed to numerous decisions from other jurisdictions that have addressed the issue of whether applicable legislative provisions establishing terms and conditions of automobile insurance contracts require self-insured lessor car rental agencies to offer uninsured motorist coverage to their lessees. Several courts have held that self-insured lessors cannot reject uninsured motorist coverage on behalf of their prospective lessees. *Twyman v. Robinson,* 255 Ga. 711, 342 S.E.2d 313 (1986); *Ashline v. Simon,* 466 So.2d 622 (La.Ct.App.1985); *Jones v. King,* 549 So.2d 350 (La.Ct.App.1989); *Hartford Ins. Co. v. Hertz Corp.,* 410 Mass. 279, 572 N.E.2d 1 (1991); *Crocker v. Transport of New Jersey,* 169 N.J.Super. 498, 404 A.2d 1293 (Law Div.1979); *Allstate Ins. Co. v. Shaw,* 52 N.Y.2d 818, 436 N.Y.S.2d 873, 418 N.E.2d 388 (1980); *Moon v. Guarantee Ins. Co.,* 764 P.2d 1331 (Okla.1988); *Modesta v. Southeastern Pa. Transp. Auth.,* 503 Pa. 437, 469 A.2d 1019 (1983); *Southern Home Ins. Co. v. Burdette's Leasing Serv., Inc.,* 268 S.C. 472, 234 S.E.2d 870 (1977). Other courts have concluded that self-insured lessors are empowered to reject uninsured motorist coverage on behalf of their prospective lessees. *Cincinnati Ins. Co. v. Hertz Corp.,* 776 F.Supp. 1235 (S.D.Ohio 1991); *Mountain States Tel. & Tel. Co. v. Aetna Casualty and Sur. Co.,* 116 Ariz. 225, 568 P.2d 1123 (App. 1977); *Lapp v. Transport Indem. Co.,* 164 Cal.App.3d 161, 210 Cal.Rptr. 135 (1985); *White v. Regional Transp. Dist.,* 735 P.2d 218 (Colo.App.1987); *Diversified Serv. v. Avila,* 606 So.2d 364 (Fla.1992); *Kohly v. Royal Indem. Co.,* 190 So.2d 819 (Fla.Dist.Ct.App. 1966); *Robinson v. Hertz Corp.,* 140 Ill. App.3d 687, 95 Ill.Dec. 111, 489 N.E.2d 332 (1986); *Hill v. Catholic Charities,* 118 Ill. App.3d 488, 74 Ill.Dec. 153, 455 N.E.2d 183 (1993).

---

12. The language of the 1965 Declaration of purpose is now codified at § 42–7–102, 17 C.R.S.

(1983); *Jordan v. Honea,* 407 So.2d 503 (La. Ct.App.1981) (superseded by statute, *see Cuccia v. Clark,* 557 So.2d 989 (La.Ct.App. 1990)); *Snyder v. Roadway Express, Inc.,* 7 Ohio App.3d 218, 455 N.E.2d 11 (1982); *American States Ins. Co. v. Utah Transit Auth.,* 699 P.2d 1210 (Utah 1985); *Shelton v. American Re–Insurance Co.,* 210 Va. 655, 173 S.E.2d 820 (1970). These decisions are to a great extent based upon examination of particular legislative provisions governing the content of automobile insurance contracts.

■ We have determined that the provisions of section 10–4–609(1) requiring an insurer to provide a named insured with the opportunity to purchase uninsured motorist coverage are applicable to automobile insurance policies covering rental vehicles. *Cf.* § 10–4–601(2)(a), 4A C.R.S. (1994). Entities such as Budget are entitled, pursuant to section 10–4–716, 4A C.R.S. (1994), to elect to become self-insurers.[13] However, the fact that Budget elected to become a "self-insurer" is not controlling. What is material is the relationship Budget had with its client, Kent. Just as North–West was an insurer by way of the rental agreement Passamano executed, Budget stands in the role as an insurer with respect to Kent in view of the rental agreement executed by Kent. In our view, Kent, as the driver named in the car rental agreement, is the named insured under the automobile insurance contract between Kent and Budget. Therefore, Budget, as an insurer, was required by section 10–4–609(1) to offer Kent, the named insured, the option of rejecting uninsured motorist protection. We reject the contrary conclusion reached by the trial court.

### III

For the foregoing reasons, we reverse the judgment of the court of appeals in *Passamano v. Travelers Indemnity Company* and also reverse the judgment of the trial court in *Kent and Brown v. Budget Rent–A–Car Systems, Inc.*

ERICKSON, J., specially concurs.

VOLLACK, J., dissents, and ROVIRA, C.J., joins in the dissent.

Justice ERICKSON specially concurring:

I specially concur. We granted certiorari pursuant to C.A.R. 50, and consolidated *Passamano v. Travelers Indemnity Co.,* 835 P.2d 514 (Colo.App.1991), with *Kent v. Budget Rent–A–Car Systems, Inc.,* for review.

The cases center on a determination of whether uninsured or under-insured motorist coverage had to be offered by a rental car agency to customers at the time that automobiles were rented. Principles of contract, bailments, and insurance law are involved, but the primary issues relate to uninsured and under-insured motorist statutes enacted by the General Assembly.

### I

### A

The facts in *Passamano* are that Passamano rented an automobile in Vail, Colorado, from ˙ North–West Leasing Corporation (North–West), a licensee of National Car Rental Systems (National). North–West was a party to a liability insurance policy issued by Travelers Indemnity Company (Travelers) that covered North–West's vehicles. North–West rejected uninsured motorist coverage when it purchased the policy from Travelers.

While driving the car near Leadville, Colorado, Passamano was involved in a collision caused by the negligence of an uninsured motorist. Passamano sustained serious injuries and filed suit against respondents Travelers, North–West, and National. In his amended complaint, Passamano alleged that

---

**13.** Section 10–4–716 states in pertinent part as follows:

 **Self-insurers.** (1) Any person in whose name more than twenty-five motor vehicles are registered may qualify as a self-insurer by obtaining a certificate of self-insurance issued by the director.

§ 10–4–716(1), 4A C.R.S. (1994). This provision, like the uninsured motorist provision, was enacted as a part of the Motor Vehicle Financial Responsibility Act. Ch. 91, sec. 3, § 13–7–51(1), 1965 Colo.Sess.Laws 333, 354.

the rental agreement, which contained provisions pertaining to liability insurance, was in fact a contract of insurance. In claiming that the respondents were the insurers and that he was the insured, Passamano asserted that respondents violated section 10–4–609(1), 4A C.R.S. (1987), by failing to offer him uninsured motorist coverage.

In their motion for summary judgment, respondents argued that because North–West was the named insured under the insurance contract executed by North–West and Travelers, only North–West had authority under section 10–4–609(1) to reject uninsured motorist coverage. Respondents also alleged that the agreement between North–West and Passamano was not an insurance contract, and that Colorado does not require rental car agencies to offer uninsured motorist coverage to their customers.

The trial court held that the agreement between Passamano and North–West was a bailment contract, not an insurance contract. Under the insurance policy issued to North–West by Travelers, the trial court determined that North–West was the named insured and Passamano the additional insured. Passamano thus had no authority to acquire or reject uninsured motorist coverage.

In affirming the trial court, the court of appeals held that a rental agreement for the lease of a vehicle from a car rental agency creates a bailment contract, not a contract of insurance, and that North–West was the named insured for purposes of section 10–4–609(1).

### B

In *Kent,* Kent rented an automobile from Budget Rent–A–Car Systems, Inc. (Budget), in Denver. Budget was self-insured, and neither offered nor provided uninsured motorist coverage to Kent.

While driving the vehicle, Kent was forced off the road by the negligent conduct of an uninsured motorist. Kent and Brown, a passenger in the car, sustained severe injuries. They filed a civil action against Budget for damages and costs, and sought a declaratory judgment to reform the rental agreement to include uninsured motorist coverage.

Budget filed a motion for summary judgment, claiming that as a self-insurer it was not required to offer uninsured motorist coverage to Kent. The trial court granted Budget's motion.

### II

### A

The intent of the General Assembly in enacting section 10–4–609(1), which provides motorists with the right to uninsured motorist coverage if not specifically rejected, was to allow motorists to protect themselves against losses caused by the conduct of negligent and financially irresponsible motorists. *Kral v. American Hardware Mut. Ins. Co.,* 784 P.2d 759, 765 (Colo.1989). As a result, section 10–4–609(1) requires that uninsured motorist coverage be offered in any motor vehicle policy, "except that the named insured may reject such coverage in writing." The purpose of the statute is to permit the insured to make an informed choice whether to purchase uninsured motorist coverage. *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905 (Colo.1992).

The General Assembly, in passing the Colorado Uninsured Motorist Act, declared:

> The General Assembly is acutely aware of the toll in human suffering and loss of life, limb and property caused by negligence in the operation of motor vehicles in our state. Although it recognizes that this basic problem can and is being dealt with by direct measures designed to protect our people of this state from the ravages of irresponsible drivers, the General Assembly is also very much concerned with the financial loss visited upon innocent traffic accident victims by negligent motorists who are financially irresponsible. In prescribing the sanctions and requirements of § 10–4–319 and Article 7 of Title 42, C.R.S. 1973, it is a policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others and *to assure the widespread availability to the insuring public* of insurance protection against financial loss caused by negligent financially irresponsible motorists.

§ 10–4–320, 4 C.R.S. (1973) (emphasis added). This statute expresses that "the legislature's prime concern is the need to compensate the innocent driver for injuries received at the hands of one from whom damages cannot be recovered." *Farmers Ins. Exchange v. McDermott,* 34 Colo.App. 305, 308–09, 527 P.2d 918, 920 (1974).

Insurance laws are to be liberally construed in order to further their remedial and beneficial purposes. *Travelers Indem. Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1976). Therefore, legislative intent to require insurers to offer uninsured motorist coverage favors the protection, or at least the opportunity for protection, of all motorists.[1] Motorists are the intended beneficiaries of uninsured motorist coverage and therefore they have the greatest incentives and reasons for either obtaining or rejecting coverage. Car rental agencies do not share that same interest with their lessees because the agencies face no risk or potential for loss that would be covered by extending uninsured motorist coverage. The risk of loss from uninsured motorists causing damage to the lessees (and which are not covered by no-fault or liability coverage for damages to others) is borne solely by the lessees. The legislative intent of guaranteeing the "widespread availability" of uninsured motorist coverage and permitting "insureds to protect themselves" would be undermined and frustrated if only car rental agencies have the opportunity to accept or reject such insurance for their lessees.

## B

A court's primary task in construing a statute is to give effect to legislative intent. *People v. Schuett,* 833 P.2d 44 (Colo.1992). To discern legislative intent, the court first looks to the language of the statute. *B.B. v. People,* 785 P.2d 132 (Colo.1990). In my view, the General Assembly's intent is clear: to allow motorists to protect themselves. This intent is clearly articulated in the General Assembly's declaration of policy. § 10–4–320. In determining the scope and intent of a statute, the best guide is often the declaration of policy. *People v. Gross,* 830 P.2d 933 (Colo.1992). Finally, in interpreting insurance laws, the court should liberally construe them to further their remedial and beneficial purposes. *Barnes,* 191 Colo. at 278, 552 P.2d at 300.

The statute should be read as a whole to give effect to the policy and objective, *Aulston v. United States,* 915 F.2d 584 (10th Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991), and avoid interpretations that nullify the purpose and intent. *Sigman By and Through Sigman v. Seafood Ltd. Partnership I,* 817 P.2d 527 (Colo.1991). When interpreting apparently conflicting provisions, the later statute prevails. § 2–4–206, 1B C.R.S. (1980); *see Lininger v. City of Sheridan,* 648 P.2d 1097 (Colo.App.1982) (stating that in interpreting conflicting statutes, the court is to give effect to the intent of the legislature evidenced by the later time of enactment).

In this case, the definition of "policy" was enacted in 1969 and the Uninsured Motorist Act was added to the section in 1979.[2] Ch. 192, sec. 1, § 79–30–1, 1969 Colo.Sess.Laws 549; ch. 69, sec. 11, § 10–4–609, 1979 Colo. Sess.Laws 358, 377. Because the Uninsured Motorist Act and its declaration of policy were enacted subsequent to the policy definition and because excluding lessees from the protection would frustrate the intent of the statute, section 10–4–609(1) requires rental agencies to provide lessees the option to purchase uninsured motorist coverage.

The definitional section begins with the phrase that the definition of "policy" is to be

---

1. There is no major change in practice in providing lessees with an opportunity to accept or reject uninsured motorist coverage. Many car rental agencies already allow customers to check boxes to select the types of coverage they wish to purchase.

2. It is noteworthy that the definition of "policy" in the provisions that were enacted with the Uninsured Motorist Act did not exclude rental agencies. *See* ch. 91, sec. 3, § 13–7–3(11) &

(12), 1965 Colo.Sess.Laws 333, 335–36. In 1979, the uninsured motorist provision was excised from the Motor Vehicle Financial Responsibility section and placed in the Automobile Insurance Regulations sections without the attending definitions. Therefore, it is evident that the intent of the General Assembly in enacting uninsured motorist coverage was not to exclude car rental agency lessees.

used "unless the context otherwise requires." § 10–4–601, 4A C.R.S. (1987). In these cases, the context of the uninsured motorist provision and the legislative intent require that "policy" in section 10–4–609(1) include the provisions of a rental agreement that provide for insurance coverage.

## III

### A

The majority reasons that North–West offered to sell Passamano various insurance options at specified rates and, therefore, was an "insurer" for purposes of section 10–4–609(1).

Uninsured motorist coverage protects the renter and his passengers rather than the car rental agency.[3] The renter thus acquires the same status as a "named insured" under a policy issued by a commercial carrier. Because the rental agency is insuring its lessees and their passengers, it has the same duty of good faith and fair dealing, and the same duty to provide statutorily required coverage, as any other insurer. *See Budget Rent–A–Car Corp. v. Martin*, 855 P.2d 1377 (Colo. 1993); *Martin v. Principal Casualty Ins. Co.*, 835 P.2d 505 (Colo.App.1991), *aff'd in part and rev'd in part on other grounds*. Part of the money paid to rent the automobile provides the insurance required by Colorado law, causing the rental agreement to become a contract between the car rental agency and its lessee. *See Davis v. M.L.G. Corp.*, 712 P.2d 985 (Colo.1986). Holding that Passamano is a named insured of the North–West/Passamano agreement and allowing him to recover as an innocent injured party for the loss caused by another's negligence gives effect to the intent of the General Assembly. *See Farmers Ins. Exchange*, 34 Colo.App. at 305, 527 P.2d at 918.

### B

The fact that Kent signed an agreement waiving uninsured motorist coverage and that Budget is a self-insurer does not distinguish this case from *Passamano* regarding the fundamental requirement that a rental agency offer uninsured motorist coverage. The relevant agreement is still between the lessee and the car rental agency. In order to give effect to the intent of the General Assembly, the lessee must be given the right to refuse uninsured motorist coverage.

Budget was an insurer with respect to Kent by virtue of the rental agreement he executed. As the driver named in the car rental agreement, Kent was the named insured under the automobile insurance contract between Kent and Budget. Budget was thus required to offer uninsured motorist protection to Kent under section 10–4–609(1).

## IV

An agreement between a car rental agency and a lessee that requires the lessee to elect particular types of insurance coverage creates an insurance contract. Section 10–4–609(1) requires automobile insurance providers, including car rental agencies, to provide motorists with the option to purchase or reject motorist coverage. Accordingly, I would reverse and remand with directions for further proceedings consistent with this concurrence.

### Justice VOLLACK dissenting:

The majority holds that North–West Leasing Corporation (North–West) was not only the named insured under its insurance policy with Travelers Indemnity Company (Travelers), but, by offering to sell to petitioner Antonio Passamano (Passamano) various insurance coverages for specified prices, was

---

**3.** Owners of businesses that utilize motor vehicles such as taxi services, trucking companies, and delivery companies insure their vehicles to protect themselves from damages caused by the tortious acts of their agents or employee drivers, for which they may be vicariously liable. Concurrent insurance protection for the drivers is incidental rather than the primary purpose of the coverage.

The purpose of liability insurance that a rental agency provides is necessarily different—car rental agencies have no vicarious liability for the tortious acts of their lessees. *Greenwood v. Kier*, 125 Colo. 333, 243 P.2d 417 (1952). Because the car rental agency has no vicarious liability, the agency provides insurance to protect those to whom it rents vehicles.

also an insurer with respect to its rental agreement with Passamano. Maj. op. at 1317, 1318. In so holding, the majority determines that North–West, as an insurer, was required to offer uninsured motorist coverage to prospective customers and that Passamano, as a named insured, was entitled to acquire or reject uninsured motorist coverage pursuant to section 10–4–609(1), 4A C.R.S. (1994). *Id.* The majority therefore concludes that the rental agreement between North–West and Passamano constitutes an insurance policy.

The majority also concludes that the rental agreement between respondent Budget Rent–A–Car Systems (Budget) and petitioner Cecil Kent (Kent) constitutes a contract of insurance and that Budget was required to offer uninsured motorist coverage to Kent pursuant to section 10–4–609(1). Maj. op. at 1323.

I disagree with the majority's conclusion that the rental agreement constitutes an insurance policy. I dissent because the rental agreements between North–West and Passamano and between Budget and Kent do not constitute contracts of insurance; employees of a car rental agency are not agents of the insurance company; and Colorado does not require rental car agencies, including self-insured rental car agencies, to offer uninsured motorist coverage to customers of the rental car company for purposes of section 10–4–609(1).[1] I would therefore affirm the judgment of the court of appeals in *Passamano v. Travelers Indemnity Co.,* and the judgment of the trial court in *Kent v. Budget Rent–A–Car Systems, Inc.*[2]

## I.

The determinative issue in these cases is whether Colorado's statutory scheme concerning Automobile Insurance Regulations requires a car rental agency to offer uninsured motorist benefits to customers renting automobiles.

In *Passamano v. Travelers Indemnity Co., National Car Rental Systems, Inc., and North–West Leasing Corp.,* 835 P.2d 514 (Colo.App.1991), the court of appeals, in affirming the trial court's entry of summary judgment, concluded that North–West, as a named insured, was not required to offer uninsured motorist benefits to Passamano in its rental agreement. According to the court of appeals, the provision of liability insurance within the rental agreement was offered to Passamano as an insured and not as a named insured. *See Nelson v. Strode Motors, Inc.,* 198 Colo. 366, 367, 600 P.2d 74, 75 (1979). The court of appeals determined that the coverage contained within the rental agreement between Passamano and North–West did not transform the car rental agreement into a contract of insurance as defined in section 10–1–102(7), 4A C.R.S. (1994).[3] *Passamano,* 835 P.2d at 516. Relying upon the language used in the rental agreement,[4] the

1. Section 10–4–609(1), 4A C.R.S. (1994), provides as follows:

 **Insurance protection against uninsured motorists.** (1) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.

2. We consolidated *Passamano v. Travelers Indemnity Co.,* 835 P.2d 514 (Colo.App.1991), and *Kent*

*v. Budget Rent-a-Car Systems, Inc.,* for our review.

3. *Section 10–1–102(7), 4A C.R.S. (1994), defines the term "insurance" as "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies."*

4. The agreement provides: "This is an **Agreement** between you and the Company to *rent to you* a motor **Vehicle**." (Second emphasis added.) Immediately above the signature line, the form contract states: "I HAVE READ THE TERMS AND CONDITIONS ON BOTH SIDES OF THIS *RENTAL* AGREEMENT AND AGREE THERETO. *RENTER'S* SIGNATURE _____." (Emphasis added.) The court of appeals stated: "These terms are consistent with those used in a rental contract; they are not the terms found in contracts of insurance." *Passamano,* 835 P.2d at 516 (emphasis added).

court of appeals ruled that the rental agreement is not a contract of insurance but is, instead, a bailment. *Id.; see Davis v. M.L.G. Corp.,* 712 P.2d 985, 987–88 (Colo. 1986) ("Leasing a vehicle from a car rental agency creates a bailment contract for the mutual benefit of the parties.").

The trial court granted the motion for summary judgment of respondents Travelers, North–West, and National Car Rental Systems, Inc. (National). Relying upon this court's decision in *Davis v. M.L.G. Corp.,* 712 P.2d 985 (Colo.1986), the trial court determined that the car rental agreement between Passamano and North–West created a bailment contract for the mutual benefit of both parties and did not constitute a contract of insurance. The trial court also determined that, under the insurance policy issued to North–West by Travelers, North–West was the named insured and Passamano was an additional insured. The trial court therefore concluded that Passamano had no authority to acquire or reject uninsured motorist coverage.

In *Kent v. Budget Rent–A–Car Systems, Inc.,* the trial court entered summary judgment in favor of Budget. The petitioners, Cecil Kent and Chuck Brown, moved for summary judgment, claiming that Budget was required to provide uninsured motorist coverage as a result of an automobile accident that involved a car rented to Kent by Budget and a vehicle driven by an uninsured motorist. Budget thereafter filed a cross-motion for summary judgment in the trial court on the basis that, as a self-insurer, it was not required to offer uninsured motorist coverage to Kent.

## II.

### A.

North–West purchased liability insurance from Travelers that covered all of North–West's vehicles. North–West maintained this liability insurance policy with Travelers, which provided automobile liability and no-fault coverage for the renters of North–

West's vehicles. North–West, as the designated named insured of Travelers' policy, exercised its option in writing to reject uninsured motorist coverage.

Passamano rented an automobile from North–West, a licensee of National. North–West's standard two-sided rental agreement elicited information concerning the customer, including the method of payment, the vehicle rented, and the rental date, and contained several options with respect to insurance coverage.[5] Prior to Passamano's signing the rental agreement form, Northwest's salesperson at the sales counter discussed with Passamano the type of vehicle to be rented and the terms of the agreement, the length of the rental term, and the optional coverage available for an additional charge, including "personal accident insurance" and a "collision damage waiver."

The rental agreement provided liability coverage and no-fault coverage provisions. The liability insurance provision in paragraph 5 of the rental agreement provided in pertinent part as follows:

### 5. LIABILITY INSURANCE

Authorized Driver is covered by an automobile liability insurance policy or qualified self-insurance arrangements ... for bodily injury or death (limits $100,000 each person, $300,000 each accident) and for property damage (limit $25,000) for each accident arising from use of Vehicle as permitted by this Agreement. Minimum Mandatory No Fault coverage as required by applicable law is also provided. Company will not provide "Uninsured Motorist" coverage, "Underinsured Motorist" coverage or supplementary "No Fault" unless such coverages are required to be provided by applicable law and cannot be rejected. If required, and not rejectable, the limits will be the minimum required by law.

The rental agreement also contained a collision damage waiver provision which stated in part: "THIS COLLISION DAMAGE WAIVER IS NOT INSURANCE."

**5.** Lessees were given an opportunity to select additional coverages which were referred to as "options" in the rental agreement.

The majority contends that the rental agreement between North–West and Passamano was substantively a contract of insurance by offering insurance coverages for specified prices. Maj. op. at 1317. I disagree.

As the court of appeals correctly determined, North–West did not undertake to indemnify Passamano within the statutory definition of "insurance" provided under section 10–1–102(7), 4A C.R.S. (1994). 835 P.2d at 516. Rather, the insurance policy between Travelers and North–West provided that Travelers was responsible for processing and paying claims against North–West. According to the court of appeals, this contractual arrangement establishes that Travelers, not North–West, was the insurer.

In my view, sections 10–1–102(7), 10–1–102(8), 4A C.R.S. (1994), and 10–2–202(1), 4A C.R.S. (1987), are dispositive on the issues of whether a rental agreement is a contract of insurance and whether the sales representatives of a car rental agency are insurance agents.

Section 10–1–102(7) defines the term "insurance" as "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies." Section 10–1–102(8) defines the term "insurer" to mean "every person engaged as principal, indemnitor, surety, or contractor *in the business of making contracts of insurance*." (Emphasis added.) Section 10–2–202(1) defines an "insurance agent" as "a person appointed by an insurer to solicit applications for a policy of insurance or to negotiate a policy of insurance on its behalf."

Applying these statutory provisions to the facts of this case, I believe there is ample evidence to support the court of appeals' holding that the rental agreement was a bailment and not an insurance contract. North–West is engaged in the business of renting motor vehicles, and not in the business of insurance sales. Accordingly, the rental agreement should not be construed as an insurance contract. North–West's sales representatives do not fall within the definition of insurance agents as set out in section 10–

2–202(1), and thus the sales representatives cannot be considered agents of Travelers. Further, neither North–West nor its salespersons were licensed by the State of Colorado to act as lawfully registered insurance agents nor authorized to issue policies of insurance to motorists.

Basic principles of contract law serve to further discredit the majority's holding a rental agreement to be a contract of insurance. A person contracts with a car rental agency with the intent to rent a car. A person renting a car does not contract with a car rental agency for the purpose of buying an insurance policy to protect him/her from an accident with an uninsured motorist. The rental agency establishes the terms and conditions in the rental agreement, including whether to provide uninsured motorist coverage. If a person accepts the terms and conditions delineated in the rental agreement, the person may rent the car. If the person does not accept the terms and conditions specified in the rental agreement, then the person does not have to rent the car.

Decisions from this court and the California Court of Appeal have arrived at a similar outcome even though these cases involved statutory contexts different from that presented here. For example, in *United States Fidelity & Guaranty Co. v. Budget Rent-A-Car Systems, Inc.*, 842 P.2d 208 (Colo.1992), where we were required to interpret a Budget rental agreement and United States Fidelity's insurance policy for purposes of basic liability coverage, we stated that the "Rental Agreement does not represent itself as an insurance contract, although it purports to insure Authorized Drivers 'in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy.'" *Id.* at 211 n. 4.

In *Nelson v. Strode Motors, Inc.*, 198 Colo. 366, 600 P.2d 74 (1979), we held that a renter of a vehicle who, as a pedestrian, was struck and injured by a car driven by an uninsured motorist, was not entitled to personal injury protection benefits for an accident which occurred away from his rented vehicle as he was not a named insured. Nelson commenced a breach of contract action against

Strode Motors, the company that had rented him the automobile, claiming that he was entitled to various insurance protections based on contract and insurance law. We viewed the renter as an insured under the existing policy, and Strode Motors as the named insured.[6] We therefore determined that Strode Motors was not obligated to obtain for the renter additional insurance coverages aside from the required liability coverage for bodily injuries and property damage.

The California Court of Appeal has also held that a rental agreement is not a policy of insurance, and that, as such, a rental company cannot be held to the standard of an insurer to provide statutorily mandated insurance coverage, including uninsured motorist coverage. *Truta v. Avis Rent–A–Car Systems, Inc.*, 193 Cal.App.3d 802, 238 Cal. Rptr. 806 (1987). The *Truta* court reviewed California appellate decisions that had already addressed the question of whether a particular entity was engaged in the business of insurance. For example, the court examined the analysis performed by *California Physicians' Service v. Garrison*, 28 Cal.2d 790, 172 P.2d 4 (1946), in which the court held that providing medical services to low-income patients who paid monthly membership dues did not constitute engaging in the insurance business because the principal purpose or object of the operation was service rather than indemnity. *Truta*, 193 Cal. App.3d at 812, 238 Cal.Rptr. 806 (citing *California Physicians' Serv.*, 172 P.2d at 16). The *Truta* court additionally analyzed the reasoning employed in *Transportation Guarantee Co. v. Jellins*, 29 Cal.2d 242, 174 P.2d 625 (1946), where the court determined that truck maintenance contracts containing provisions that the maintenance company agree to insure the vehicles for the owner with an authorized insurance company did not constitute insurance contracts. The *Transportation Guarantee Co.* court stated:

"We are satisfied that a sound jurisprudence does not suggest the extension, by judicial construction, of the insurance laws to govern every contract involving an assumption of risk or indemnification of loss; that when the question arises each contract must be tested by its own terms as they are written, as they are understood by the parties, and as they are applied under the particular circumstances involved."

*Truta*, 193 Cal.App.3d at 813–14, 238 Cal. Rptr. 806 (quoting *Transportation Guarantee Co.*, 174 P.2d at 629).

The court in *Transportation Guarantee Co.* continued:

"Plaintiff's obligations (with their reciprocal contractual rights) to make repairs, to maintain the truck in good running order, and to keep a truck constantly available to the owner except for reasonable service periods, do not in our opinion, make the plaintiff an insurer. Such obligations are similar to those ordinarily undertaken by a lessor of motor vehicles and, unless we are prepared to hold that any lessor of such vehicles, entering into such a contract, is in the insurance business, then we should not hold that plaintiff is, on that account, in such business."

*Truta*, 193 Cal.App.3d at 814, 238 Cal.Rptr. 806 (quoting *Transportation Guarantee Co.*, 174 P.2d at 631–32).

In summary, I conclude that a car rental agreement does not constitute a contract of insurance for the purposes of section 10–1–102(7), and that sales representatives of a car rental agency are not agents of an insurance company as provided in section 10–2–202(1). I further hold that a car rental agency does not assume the status of an insurer pursuant to section 10–1–102(8) since a car rental agency is not in the business of making contracts of insurance. The court of appeals therefore correctly determined that the rental agreement between Passamano and North–West was a bailment and not an insurance contract, and that North–West, as a named insured, was not required to offer uninsured motorist benefits to Passamano.

**6.** In *Nelson*, the controlling statute was § 10–4–706, 4A C.R.S. (1973), governing no-fault benefits. Nevertheless, the distinction between the status of a renter of a vehicle as an insured, and not as a named insured, cannot be diminished.

B.

The majority performs a laborious statutory construction analysis and examination of the legislative history behind Part 6 of Title 10, Article 4, and consequently digresses from the plain meaning of the relevant statutory provisions.

Pursuant to well-accepted rules of statutory construction, a statute is to be interpreted and applied so as to give meaning to all portions thereof, based upon the plain meaning of its terms. *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991); *A.B. Hirschfeld Press, Inc. v. City and County of Denver*, 806 P.2d 917, 920 (Colo. 1991). Further, when the legislature defines a term, courts must give meaning to that definition, and use that definition wherever it appears in the statute. *R.E.N. v. City of Colorado Springs*, 823 P.2d 1359, 1364 (Colo. 1992). Moreover, it is axiomatic that, when the statutory language is clear and unambiguous, the courts should interpret the statute as written and need not resort to the rules of statutory construction. *Jones v. Cox*, 828 P.2d 218, 221 (Colo.1992); *Bloomer v. Board of County Comm'rs of Boulder County*, 799 P.2d 942, 944 (Colo.1990).

The term "automobile policy" is defined within section 10–4–601, 4A C.R.S. (1994), which provides that the definition of "policy" is to be utilized in Part 6 of Title 10, Article 4, "unless the context otherwise requires":

**Definitions.** As used in this part 6, unless the context otherwise requires:

. . . .

(2) "Policy" means an automobile insurance policy providing coverage for all or any of the following coverages: Collision, comprehensive, bodily injury liability, property damage liability, medical payments, and uninsured motorist coverage, or a combination automobile policy providing bodily injury liability, property damage liability, medical payments, uninsured motorist, and physical damage coverage, delivered or issued for delivery in this state, insuring a single individual, or husband and wife, or family members residing in the same household, as named insured, and under which the insured vehicles therein designated are of the following types only:

(a) A motor vehicle of the private passenger or station wagon type that is not used as a public or livery conveyance for passengers nor rented to others[.]

Section 10–4–608, 4A C.R.S. (1994), which exempts from the protection of part 6 those policies insuring more than four vehicles or covering garages, automobile sales agencies, and similar commercial enterprises, provides as follows:

**Exemptions.** This part 6 shall not apply to any policy . . . insuring more than four automobiles, or to any policy covering a garage, automobile sales agency, repair shop, service station, or public parking place operation hazard, or to any policy of insurance issued principally to cover personal or premises liability of an insured even though such insurance may also provide some incidental coverage for liability arising out of the ownership, maintenance, or use of the motor vehicle on the premises of such insured, or on the ways immediately adjoining such premises.

Section 10–4–609(1), 4A C.R.S. (1994), governs uninsured motorist benefits, and dictates under what circumstances such benefits must be provided:

No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.

In my view, the statutory language is unambiguous and therefore we are bound to apply the statutes as written. Only by construing the statutory provisions in part 6 together do we effectuate the plain meaning

of the relevant statutes. Based on my reading of sections 10–4–601, 10–4–608, and 10–4–609 together, I conclude that the uninsured motorist provision does not apply to a car rental agreement covering motor vehicles that are rented to others or to an automobile insurance policy insuring more than four vehicles.[7]

The majority concludes that the rental agreement constitutes an automobile liability insurance policy pursuant to section 10–4–609(1). The majority reaches this conclusion by determining that the definition of "policy" in section 10–4–601(2) applies only to sections 10–4–601 to –608, and not to section 10–4–609. In devising this holding, the majority jumps through endless hoops to reach this result.

The majority does not construe the language in section 10–4–601 as exempting liability insurance policies covering rental vehicles from the provisions of section 10–4–609(1). Maj. op. at 1318. I do. In looking at the rental *agreement* only, the majority so quickly forgets that section 10–4–601 defines *"policy"* as an automobile liability insurance policy providing uninsured motorist coverage to an insured vehicle which is *not* rented to others.

The majority's emphasis on the chronological history of the Automobile Insurance Policy Cancellation Act—first articulated in 1969 as sections 72–30–1 to –8, and recodified in 1973 as sections 10–4–601 to –608, 4 C.R.S. (1973)—fails to convince me that the uninsured motorist provision—originally codified in 1965 as section 72–12–19 (1965 Perm. Supp.), and later removed from the Motor Vehicle Financial Responsibility section and added in 1979 by amendment to the Automobile Insurance Regulations section, as section 10–4–609, 4 C.R.S. (1973 & 1979 Supp.)—should be read separately from the other provisions in part 6. Contrary to the majority's contention, the decision of the General Assembly in 1979 to reenact section 72–12–19 as section 10–4–609 reflects the General Assembly's intent to have the definition of "poli-cy" articulated within part 6 to also apply to uninsured motorist coverage. Nothing contained within section 10–4–609 "otherwise requires" that a different definition of "policy" apply from that provided in section 10–4–601(2). If the General Assembly had not intended the definitions provided in 10–4–601, or the exemptions provided in 10–4–608, to apply to 10–4–609, the General Assembly could easily have stated so in 1983, when the uninsured motorist section was again amended into its present form. The General Assembly, however, made no express effort to isolate 10–4–609 from the rest of part 6.

In defining the term "policy" in section 10–4–601(2) to mean an automobile liability insurance policy insuring certain types of vehicles but excluding motor vehicles *rented* to others, I conclude that section 10–4–609 does not apply to the rental agreement issued by North–West to Passamano. My conclusion is further reinforced by examining the other relevant statutory provisions in part 6 and sections 10–1–102(7), 4A C.R.S. (1994), 10–1–102(8), 4A C.R.S. (1994), and 10–2–202(1), 4A C.R.S. (1987).

The majority also discounts the exemptions created in section 10–4–608 by construing the rental agreement in isolation from North–West's automobile liability insurance policy with Travelers. In performing this creative mechanical maneuver, the majority casually passes off the undisputed fact that North–West, by virtue of being a rental car agency, insured more than four automobiles.[8] The plain language of section 10–4–608 provides that no part of part 6, including section 10–4–609, shall require an automobile insurer who issues a policy insuring more than four automobiles to provide or offer uninsured motorist coverage. Contrary to the majority's analysis, I believe that the exemptions provided in section 10–4–608 apply to the facts of this case.

In my view, the majority's decision is also irreconcilable with the plain language of section 10–4–609. The uninsured motorist statute requires an insurer who provides an au-

---

7. The record indicates that North–West owned, leased, and/or operated a fleet of approximately 700 vehicles in the course of its rental activities.

8. The majority states the obvious: the rental agreement between North–West and Passamano covers only one vehicle.

tomobile liability insurance policy to offer uninsured motorist coverage to the named insured although such coverage may be rejected in writing by the named insured.[9] Section 10–4–609 requires that no automobile liability insurance policy be delivered, issued for delivery, or renewed, unless coverage is provided to protect against uninsured motorists. The statutory language explicitly addresses the rights and duties of the insurer and the insured under a contract of insurance. To read into the language a requirement that a car rental agency under the terms of a *rental agreement* must provide uninsured motorist coverage would distort its clear and unambiguous meaning.

### III.

Kent rented an automobile from Budget. The agreement contained the following relevant provisions:

6) **LIABILITY INSURANCE:** IF THERE IS NO VIOLATION OF ANY OF THE USE RESTRICTIONS IN PARAGRAPH 5 ABOVE, Renter and any Authorized Driver shall, while operating the Vehicle, be provided with liability coverage in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy or in accordance with the requirements of a qualified self-insurer instead of such coverage, for protection against liability for causing bodily injury (including death) and property damage with one of the following applicable coverage limits:

—coverage limits imposed by the state financial responsibility law where this rental transaction takes place; OR

—coverage limit of $100,000 for each person, but not more than $300,000 for each occurrence, and property damage limits of up to $25,000 for each occurrence if a Renter, at time of rental, possessed valid Budget CorpRate or Sears Checklist Charge credentials, and such rental is charged at a valid Budget CorpRate or Sears Checklist Charge rate.

(If S.L.I. is offered and accepted, a higher limit of liability insurance will be provided as described in the applicable brochure[.])

A. All coverages automatically conform to the basic requirements of any "No-Fault" law which may be applicable. RENTER WAIVES UNINSURED AND UNDERINSURED MOTORIST, SUPPLEMENTAL NO-FAULT AND OTHER OPTIONAL COVERAGES.

B. If any coverages herein cannot be excluded or waived, Renter agrees that such coverages shall be automatically reduced to the minimum requirements of the applicable financial responsibility law and that such coverages shall be excess to any other applicable insurance.

Budget was self-insured, and neither offered nor provided uninsured motorist coverage to Kent. As a self-insurer, Budget is obligated to provide only statutorily mandated benefits, namely, liability and no-fault benefits as required under the Colorado Auto Accident Reparations Act. Section 10–4–716, 4A C.R.S. (1994), sets forth the obligations of self-insurers and provides in pertinent part as follows:

(1) Any person in whose name more than twenty-five motor vehicles are registered may qualify as a self-insurer by obtaining a certificate of self-insurance issued by the director.

(2) The director may, in his discretion, upon the application of such person, issue a certificate of self-insurance when he is satisfied that such person is possessed and will continue to be possessed of ability to pay direct benefits as required under section 10–4–706 and to pay any and all judgments which may be obtained against such person.

The majority discounts Budget's status as a self-insurer and instead finds the relationship between Budget and Kent controlling. In the majority's view, Kent is the named insured and Budget is the insurer under the rental agreement executed between Kent and

9. In the instant case, Travelers, the insurance company, properly offered uninsured motorist coverage to its named insured, North–West, which exercised its option to reject uninsured motorist coverage. The offer and rejection satisfy the requirements of § 10–4–609, and are valid and effective.

Budget. Maj. op. at 1323. Consequently, the majority concludes that Budget was required to offer Kent the option of rejecting uninsured motorist coverage pursuant to section 10–4–609(1). The majority makes an unconvincing attempt to downplay Budget's status as a self-insurer which in my view dictates whether Budget is required to offer uninsured motorist coverage to its customers.

In *Passamano v. Travelers Indemnity Co.*, 835 P.2d 514 (Colo.App.1991), the court of appeals stated:

> The trial court correctly relied on *White v. Regional Transportation District*, 735 P.2d 218 (Colo.App.1987) (self-insurers need not provide uninsured motorist coverage in the absence of a legislative declaration) in its refusal to judicially legislate this interpretation. We reach the same conclusion. The issue is best left to the General Assembly for its consideration.
>
> In summary, we hold that the automobile rental agreement here is not an insurance contract. By definition, then, plaintiff is not a "named insured" thereunder.

*Id.* at 517.

Section 10–4–716 requires only that a self-insurer be possessed with the ability to pay no-fault benefits as required under section 10–4–706, 4A C.R.S. (1994), and to pay any and all judgments which may be obtained against the self-insurer. Budget's waiver of uninsured motorist coverage complied with section 10–4–716 since Budget is neither required by law to offer nor provide such benefits. *White v. Regional Transp. Dist.*, 735 P.2d 218 (Colo.App.1987).

The issue of whether a self-insurer is required to provide uninsured motorist coverage to the driver or passengers of a self-insurer's vehicle has already been resolved by our courts. In *White v. Regional Transportation District*, 735 P.2d 218, 219 (Colo. App.1987), the court of appeals determined that section 10–4–609(1) does not apply to self-insurers. The court of appeals noted that the majority of courts who have addressed this issue have held that a certificate of self-insurance is not an insurance policy, and thus, self-insurers are not required to obtain uninsured motorist coverage for the benefit of drivers and passengers of a self-

insurer's vehicles in the absence of statutory provisions to the contrary. In electing to follow the majority rule, the court of appeals stated:

> The General Assembly's failure to include any reference to a certificate of self-insurance in any of the statutes dealing with uninsured motorist coverage evidences its intent not to require self-insurers to obtain uninsured motorist coverage. Section 10–4–609(1), C.R.S. (1986 Cum. Supp.), which obligates insurance companies to offer uninsured motorist coverage, makes no mention of certificates of self-insurance. Concomitantly, §§ 10–4–716, C.R.S. and 42–7–501, et seq., C.R.S. (1984 Repl.Vol. 17), which detail the manner in which a certificate of self-insurance is obtained, contain no provisions regarding uninsured motorist coverage.

*White*, 735 P.2d at 219.

The majority of other jurisdictions have held that self-insurers, including self-insured lessor car rental agencies, are not required to offer uninsured motorist benefits to their lessees. For example, in *Diversified Services, Inc. v. Avila*, 606 So.2d 364 (Fla.1992), the court resolved the issue as to whether a self-insured automobile leasing company is required to offer uninsured motorist coverage. The *Diversified Services* court found its recent decision in *Lipof v. Florida Power and Light*, 596 So.2d 1005 (Fla.1992), where the Supreme Court of Florida determined that the term "motor vehicle liability policy" is defined as a policy "issued by any insurance company authorized to do business in this state," to be instructive to this case. *Diversified Servs.*, 606 So.2d at 366 (quoting *Lipof*, 596 So.2d at 1007). Because the employer in *Lipof* was not an insurance company, the court concluded that the employment agreement did not fit within the definition of a "motor vehicle liability policy." Consequently, the *Diversified Services* court held that Budget's rental agreement was not a policy of insurance and Budget, as a self-insurer, had no duty to offer or provide uninsured motorist benefits to its renters. Other courts have reached similar holdings. *See Robinson v. Hertz Corp.*, 140 Ill.App.3d 687, 95 Ill.Dec. 111, 489 N.E.2d 332 (1986)

(holding that a self-insured auto rental company need not provide uninsured motorist coverage to renters); *Lapp v. Transport Indem. Co.*, 164 Cal.App.3d 161, 210 Cal.Rptr. 135 (1985) (finding that a car rental company legally waived uninsured motorist coverage and such waiver binds renter of vehicle); *Reeves v. Wright & Taylor*, 310 Ky. 470, 220 S.W.2d 1007, 1010 (1949) ("[T]he owner of the leased automobiles is not engaged in the insurance business when he procures a certificate of self insurance from the Department of Revenue in lieu of a liability insurance policy. The certificate merely shows that he has produced evidence of financial responsibility."); *Mountain States Tel. & Tel. Co. v. Aetna Casualty and Surety Co.*, 116 Ariz. 225, 568 P.2d 1123 (App.1977) (finding that a self-insured employer had no duty to provide uninsured motorist coverage to an employee injured on the job notwithstanding Arizona's statutory requirement that uninsured motorist coverage be included in any policy of motor vehicle liability insurance).

Although Budget's status as a self-insurer provides an additional reason why it was not required to offer uninsured motorist protection to its customers, my analysis of the statutory provisions in part 6, discussed *supra*, governs with equal force the situation presented here. Accordingly, the exemption contained within section 10–4–608, 4A C.R.S. (1994), excluding part 6 from applying to a policy insuring more than four automobiles, applies to these facts since Budget, as a certified self-insurer, had to possess more than twenty-five automobiles pursuant to the requirements in section 10–4–716. Based on this exemption, the coverage required under section 10–4–609 does not apply. Therefore, for the same reasons that North–West was not required to offer uninsured motorist coverage, Budget also was not required to offer uninsured motorist coverage pursuant to section 10–4–609. I would therefore affirm the trial court's entry of summary judgment in favor of Budget.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.