R.W. COLBY, as guardian and next friend of Dean L. Colby, an incapacitated adult, Petitioner,

v.

PROGRESSIVE CASUALTY INSURANCE COMPANY, Respondent.

Carol THOMPSON, individually; and Scott Hageman, by and through his Conservator and Guardian, Carol Thompson, Petitioners,

v.

BUDGET RENT–A–CAR SYSTEMS, INC., Respondent.

Nos. 95SC537, 95SC590.

Supreme Court of Colorado, En Banc.

Dec. 16, 1996.

Rehearing Denied Jan. 13, 1997.

Wilcox & Ogden, P.C., Ralph Ogden, Denver, for Petitioner in No. 95SC537.

Anderson, Campbell and Laugesen, P.C., Richard W. Laugesen, Denver, for Respondent in No. 95SC537.

Fischer, Howard & Francis, Steven G. Francis, Fort Collins, for Petitioner in No.95SC590.

Burg & Eldredge, P.C., Scott J. Eldredge, Kirstin G. Lindberg, Denver, for Respondent in No. 95SC590.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *Colby v. Progressive Casualty Insurance Company*, 908 P.2d 1170 (Colo.App. 1995), the court of appeals held that respondent, Progressive Casualty Insurance Company (Progressive), satisfied its obligations to pay rehabilitation benefits to petitioner, R.W. Colby (Colby), pursuant to section 10–4–706(1)(c), 4A C.R.S. (1987), of the Colorado Auto Accident Reparations Act (the Act) by paying Colby $50,000. In so doing, the court

of appeals reversed the contrary summary judgment entered by the trial court. In *Thompson v. Budget Rent–A–Car Systems, Inc.*, No. 94CV193 (Larimer County Dist. Ct., Oct. 14, 1994; Dec. 23, 1994; and Jan. 19, 1995), the trial court entered three partial summary judgments in favor of petitioner Carol Thompson and against respondent Budget Rent–A–Car Systems, Inc. (Budget), holding that Budget's obligation to pay rehabilitation benefits to Thompson was not limited to $50,000 pursuant to section 10–4–706(1)(c). We granted Colby's petition for certiorari review of the propriety of the court of appeals' decision in *Colby* and also granted Thompson's petition, filed pursuant to C.A.R. 50, for pre-judgment certiorari review of the propriety of the trial court's three judgments in *Thompson* to review the conflicting constructions of the provisions of section 10–4–706(1)(c) reflected therein. For the reasons stated below, we affirm the judgment of the court of appeals in *Colby*, reverse the judgments of the trial court in *Thompson*, and remand each case to the appropriate trial court for further proceedings consistent with this opinion.

### I

### A

While traveling as a passenger in a vehicle driven by Thomas Sumners, Colby's ward, Dean Colby, sustained a broken neck in a traffic accident on March 27, 1993, and is a quadriplegic. Sumners at that time owned a no-fault insurance policy issued by respondent Progressive that provided coverage for rehabilitation benefits in the amount of $50,000.[1] Progressive paid $50,000 in rehabilitation benefits for the benefit of Dean Colby

---

1. The Progressive insurance policy issued to Sumners contained the following pertinent language concerning rehabilitation benefits:

   [O]ur liability for personal injury protection benefits with respect to bodily injury sustained by any eligible injured person in any one motor vehicle accident is limited as follows:

   . . . .

   2. rehabilitation expenses shall not include medical expenses, and the maximum amount

payable shall not exceed fifty thousand dollars ($50,000.00)....

(Emphasis omitted). The Act is incorporated into every automobile insurance policy. *Allstate Ins. Co. v. Allen*, 797 P.2d 46, 49 (Colo.1990). Thus, if the insurance policies at issue here purported to provide less than the minimum coverages required by the Act, the policies would be reformed to provide those minimum coverages.

within one year of the accident, but refused to pay additional rehabilitation benefits for rehabilitation expenses incurred by Dean Colby.

Colby commenced this declaratory judgment action as guardian for Dean Colby seeking a determination that Progressive was responsible for the payment of rehabilitation costs in excess of $50,000 and incurred more than five years after the accident. Both parties submitted motions for summary judgment. The trial court granted Colby's motion, denied Progressive's motion, and entered judgment in favor of Colby. The court held that section 10–4–706(1)(c)(II) created a rebuttable presumption that an insurer who has paid $50,000 within five years has satisfied its statutory obligation.

Progressive appealed, and the court of appeals reversed the trial court's judgment and remanded with directions to dismiss Colby's complaint. The court of appeals held that Sumners's insurance policy complied with the provisions of section 10–4–706(1)(c)(II) because it required Progressive to pay up to $50,000 in rehabilitation benefits.[2] *Colby,* 908 P.2d at 1173. The court of appeals also concluded that the presumptive language contained in section 10–4–706(1)(c)(II) "applies to years only so that an insurer may be required to pay additional benefits if less than $50,000 has been paid within five years." *Colby,* 908 P.2d at 1173.

## B

While traveling as a passenger in a Budget rental car driven by Steve Miles, Thompson's ward, Scott Hageman, was seriously injured on June 12, 1993, in a traffic accident. Hageman claimed benefits under a no-fault self-insurance policy maintained by Budget for the driver of the rental car.[3] Budget paid $50,000 in rehabilitation benefits for the benefit of Hageman within one year of the accident, but refused to pay additional rehabilitation benefits for rehabilitation expenses incurred by Hageman.

Thompson commenced this action, individually and as guardian for Scott Hageman, against Budget, seeking, *inter alia,* a declaratory judgment that Budget is liable for Hageman's future rehabilitation expenses. Both parties filed motions for partial summary judgment on the issue of whether Budget could be required to pay more than $50,000 in rehabilitation benefits. The trial court granted Thompson's motion and denied Budget's motion, holding that section 10–4–706(1)(c)(II) created a rebuttable presumption that an insurer's obligation has been met when $50,000 has been paid. *Thompson v. Budget Rent–A–Car Systems, Inc.,* No. 94CV193 (Larimer County Dist. Ct., July 11, 1994).

Based on this order, Thompson filed three motions for partial summary judgment for rehabilitation benefits exceeding $50,000. The trial court granted these motions, entered judgments against Budget totalling $140,963.62, and certified the judgments as final pursuant to C.R.C.P. 54(b). Budget satisfied the three judgments and appealed. Thompson then filed the petition for certiorari before judgment, pursuant to C.A.R. 50, with this court, which petition was granted.

## II

■ The second issue contained in Thompson's petition for certiorari requires a deter-

---

**2.** In *Thompson,* the trial court held that a rebuttable presumption is created that the insurer has met its obligation when $50,000 has been paid. However, the trial court also concluded that, as the trial court determined in *Robertson v. Allstate Insurance Company,* 92–M–522 (D.Colo.1993) (opinion later withdrawn on stipulation of parties), § 10–4–706(1)(c)(II) sets no definite time limitation. In these cases both insurers paid $50,000 prior to the expiration of five years from the date of the accident. Thus, no issue is presented here concerning the import of the phrase "within five years" in the context of § 10–4–706(1)(c)(II).

**3.** The Budget no-fault self-insurance policy contained the following pertinent language concerning coverage for rehabilitation benefits:

All coverages automatically conform to the basic requirements of any "No Fault" law which may be applicable. RENTER WAIVES UNINSURED AND UNDERINSURED MOTORIST, SUPPLEMENTAL NO FAULT AND OTHER OPTIONAL COVERAGES.

mination of whether Budget failed to offer supplemental insurance coverage to Miles, as required by section 10–4–710, 4A C.R.S. (1992 Supp.). Thompson argues that Budget did not offer such supplemental insurance coverage to Miles and that, citing *Passamano v. Travelers Indemnity Company*, 882 P.2d 1312 (Colo.1994), Budget must therefore be found liable for all of Hageman's rehabilitation expenses. This issue, however, was not addressed by the trial court in the proceedings we have agreed to review pursuant to C.A.R. 50.

This action was commenced on April 1, 1994. The complaint does not allege that Budget failed to offer supplemental insurance coverage to the driver. The complaint was accompanied by a motion for partial summary judgment, which motion does not assert that Budget failed to offer supplemental coverage to Miles.[4] Budget opposed this motion[5] and filed its own motion for partial summary judgment concerning the construction of section 10–4–706(1)(c)(II). Budget's motion does not address the question of whether it offered Miles supplemental coverage.

The trial court granted Thompson's motion and denied Budget's motion on July 11, 1994. The trial court's order does not discuss the issue of whether Budget failed to offer supplementary coverage to Miles. Budget filed a motion for reconsideration, and Thompson opposed the motion; neither party raised the supplementary coverage issue, and the trial court's October 14, 1994, order denying Budget's motion for reconsideration does not address that issue.

Based on the July 11, 1994, order Thompson filed three motions for partial summary

judgment for rehabilitation benefits exceeding $50,000. The trial court granted these motions in three separate orders dated October 14, 1994; December 23, 1994; and January 19, 1995. Each order was certified as final, pursuant to C.R.C.P. 54(b), for purposes of this appeal.

On November 20, 1994, Thompson filed a fourth motion for partial summary judgment. In this motion Thompson asserted that Budget is liable for all medical expenses, without time or dollar limitation, incurred by Hageman because Budget failed to offer supplemental insurance coverage to Miles, as required by section 10–4–710, 4A C.R.S. (1992 Supp.). The record before us does not contain the trial court's order resolving that motion.[6]

■ The record before us compels the conclusion that the second issue upon which we granted certiorari in *Thompson* was not addressed by the trial court in the orders underlying Budget's appeal in this case. Issues not decided by the lower court may not be addressed for the first time on appeal. *See Committee for Better Health Care for All Colo. Citizens v. Meyer*, 830 P.2d 884, 888 (Colo.1992). Accordingly, we conclude that certiorari was improvidently granted on the issue of whether Budget offered Miles supplementary insurance, and, order that Thompson's petition be denied with respect to that issue.

### III

■ Both Colby and Thompson assert that they are entitled to additional rehabilitation benefits under the terms of the policies and the provision of section 10–4–706(1)(c)(II), 4A

---

4. The record before us does not contain an affidavit of Thompson that apparently was filed in support of this motion.

5. The trial court's registry of action indicates that Budget answered the original complaint. The record before us does not contain a copy of the answer. Although we granted Budget's motion to supplement the record to supply a copy of the answer, Budget has not done so.

6. Pleadings filed with this court after we granted certiorari suggest that an order was entered on this issue in Thompson's favor and that Budget has filed an appeal of that order with the court of appeals. Budget attached as appendix IX to its answer brief an affidavit by Miles concerning whether he would have purchased additional insurance if it had been offered. Thompson moved to strike appendix IX, and we granted Thompson's motion.

C.R.S. (1987). They contend that section 10–4–706(1)(c)(II) creates a rebuttable presumption that an insurer has satisfied its statutory obligation to pay such benefits when $50,000 has been expended within five years and that, if this presumption is overcome by evidence that the sum of $50,000 is insufficient to pay the cost of rehabilitation benefits, the insurer must pay all reasonable costs for rehabilitation without limitation. We do not agree with this argument.

## A

In resolving whether section 10–4–706(1)(c)(II), 4A C.R.S. (1987), requires insurers to assume liability for rehabilitation benefits in excess of $50,000, we start with the statutory language. In construing statutory provisions, our obligation is to give full effect to the legislative intent. *Conte v. Meyer*, 882 P.2d 962, 965 (Colo.1994). If the legislative intent is immediately conveyed by the commonly understood and accepted meaning of the statutory language, we need look no further and must give effect to the statute as written. *PDM Molding, Inc. v. Stanberg*, 898 P.2d 542, 545 (Colo.1995). However, if the statutory language is ambiguous and therefore susceptible of alternate constructions, we must consider principles of statutory construction to ascertain the legislative intent. § 2–4–203(1), 1B C.R.S. (1980); *Aetna Casualty & Sur. Co. v. McMichael*, 906 P.2d 92, 97 (Colo.1995); *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.1989); *see Krieg v. Prudential Property & Casualty Ins. Co.*, 686 P.2d 1331, 1335 (Colo.1984). For example, we may consider the textual context, *Krieg*, 686 P.2d at 1335; the statute's legislative history; the state of the law prior to the legislative enactment, *Charnes v. Boom*, 766 P.2d 665, 667 (Colo.1988); the problem addressed by the legislation; and the relationship between the particular legislation and other relevant legislative provisions in an effort to discern the legislative intent. *Id.;* *see Rowe v. People*, 856 P.2d 486, 489 (Colo.1993); *Schubert v. People*, 698 P.2d 788, 793–94 (Colo.1985).

In 1993, when the accidents underlying these two cases occurred, section 10–4–706(1) required an insurer to provide the following coverages:

(1) Subject to the limitations and exclusions authorized by this part 7, the minimum coverages required for compliance with this part 7 are as follows:

. . . .

(b) Compensation without regard to fault, up to a limit of fifty thousand dollars per person for any one accident, for payment of all reasonable and necessary expenses for medical ... services ... performed within five years after the accident for bodily injury arising out of the use or operation of a motor vehicle; ...

(c)(I)(A) Compensation without regard to fault for payment of the cost of rehabilitation procedures or treatment and rehabilitative occupational training necessary because of bodily injury arising out of the use or operation of a motor vehicle....

. . . .

(c)(II) An insurer obligated to provide direct benefits under this section shall be presumed to have complied with the provision for rehabilitation when the value of rehabilitation services or treatment provided under paragraph (c) of subsection (1) of this section shall have reached fifty thousand dollars within five years after an accident involving a motor vehicle.

§ 10–4–706(1), 4A C.R.S. (1987).

Petitioners construe this statutory language as creating a rebuttable presumption of compliance. Under petitioners' construction, after the insurer has paid $50,000 within five years of the accident, an insured holding this minimum coverage policy may prove that he or she still requires further rehabilitation services and compel the insurer to pay all additional costs until rehabilitation services are no longer necessary. We believe that the result of petitioners' construction is contrary to the legislative intent expressed by the language of section 10–4–706(1)(c)(II) as reflected by the relevant legislative history.

One purpose of the Act is to "avoid inadequate compensation." § 10–4–702, 4A

C.R.S. (1994). Construing section 10–4–706(1)(c)(II) to require insurers to provide unlimited rehabilitation benefits does far more than avoid inadequate compensation; it requires insurers to become guarantors of such benefits in amounts not susceptible to rational premium calculation. The Act was adopted in part for the purposes of encouraging lower insurance premiums and providing some measure of predictability to the rate-setting process. *See Tate v. Industrial Claim Appeals Office,* 815 P.2d 15, 21 (Colo. 1991). The conflicts created between some purposes of the Act and the construction of section 10–4–706(1)(c)(II) proposed by petitioners justify consideration of available legislative history for clarification of the legislative intent.

A further reason exists to consult relevant legislative history. Petitioners' construction of section 10–4–706(1)(c)(II) conflicts with section 10–4–710. Section 10–4–710 authorizes insurers to provide coverage "more extensive" than the required minimums. § 10–4–710(1), 4A C.R.S. (1992 Supp.). This provision supports the insurers' argument that the rehabilitation benefits coverage established by section 10–4–706(1)(c)(II) constitutes minimum coverage. If section 10–4–706(1)(c)(II) already requires an insurer to pay direct rehabilitation benefits in an unlimited amount, no more extensive coverage for such benefits could be provided.

Another construction of section 10–4–706(1)(c)(II) is possible which avoids these difficulties. The word "presume" means, *inter alia,* "to accept as true or credible without proof or before inquiry." Webster's Third New International Dictionary 1796 (1986). Persons who presume a fact have completed any inquiry and accept the fact as true. This construction of section 10–4–706(1)(c)(II), in which the word "presume" establishes a monetary cap, comports with

the provisions of section 10–4–710 that contemplate a scenario in which more extensive coverage may be offered and purchased. Such construction is also consistent with several purposes of the Act and permits a harmonious reconciliation of the provisions of section 10–4–706(1)(c)(II) and section 10–4–710.

**B**

Legislative history provides guidance in construing ambiguous statutory language. § 2–4–203(1)(c), 1B C.R.S. (1980); *Aetna Casualty & Sur. Co. v. McMichael,* 906 P.2d 92, 97 (Colo.1995). Progressive and Budget emphasize the legislative declaration accompanying the 1994 amendment to the Act, which declaration states that the rehabilitation benefits established by the Act were originally intended to be limited "in both time and amount." Act of May 4, 1994, ch. 187, § 1, 1994 Colo. Sess. Laws 1066. Although this declaration of legislative intent is not controlling with respect to the intent of the legislature as it existed in 1973, it is of some assistance. *See People v. Holland,* 708 P.2d 119, 121 (Colo.1985).

Other legislative history is more persuasive. The General Assembly first considered no-fault legislation in 1971 and 1972. It ultimately enacted House Bill 1027, the initial version of the Act in 1973. The relevant language concerning rehabilitation benefits was the same as it was when this case arose except that the amount referred to in the statute was $25,000, rather than $50,000. By 1973, thirteen states had enacted some form of no-fault legislation. 1 No–Fault and Uninsured Motorist Automobile Insurance, § 4.30 (1996).[7] Of those states, six provided for rehabilitation benefits, either as a component of medical expenses or as a separate category.[8] None of the statutes in the latter six

---

7. States which enacted some form of no-fault legislation prior to Colorado were: Massachusetts, Connecticut, New Jersey, Florida, Illinois, Oregon, Delaware, Maryland, Minnesota, South Dakota, Michigan, Arkansas, and New York. 1 No–Fault and Uninsured Motorist Automobile Insurance, § 4.30[1], [2].

8. 1 No–Fault and Uninsured Motorist Automobile Insurance, § 11.20[4] (Connecticut [included within economic loss, subject to a $5,000 cap], Florida [included within medical benefit, subject to a $10,000 cap], Michigan [all reasonable expenses], Minnesota [included within medical expense, subject to a $20,000 cap and notification

states contained language similar to the presumption language here considered; all of such statutes, except Michigan's, established a cap on rehabilitation benefits.

When testifying in support of House Bill 1027 to a House committee in 1973, Representative Carl Gustafson, who sponsored the bill, stated that the proposed legislation would "provide rehabilitation benefits up to $25,000" and emphasized that such provision represented a change from the then current circumstance in which insurers did not have to offer any rehabilitation benefits to insureds. *Hearings on H.B. 1027 Before the House Committee on Business Affairs & Labor,* 49th Gen. Assembly, 1st Session (audio tape A, Jan. 26, 1973). When presenting the bill to a Senate committee, Representative Gustafson stated that the no-fault bill was designed to increase the benefit level without increasing current premium rates. *Hearings on H.B. 1027 Before the Senate Committee on Business Affairs & Labor,* 49th Gen. Assembly, 1st Session (audio tape E, Feb. 21, 1973). While explaining the required benefit package, he described "$25,000 rehabilitation costs" as one of the benefits offered. *Id.* Later, while explaining that emotional injury is not a component of bodily injury for medical or rehabilitation expenses, he made the following comment: "and that is limited to [pause] rehabilitation is $25,000 within five years." *Id.* (audio tape F, Feb. 28, 1973).

Written material published in connection with the efforts to enact the initial no-fault statute also supports the conclusion that the General Assembly intended to adopt a specific dollar limitation in 1973. An annotated version of the original draft bill submitted to the General Assembly by the Colorado Legislative Council explained the provision requiring rehabilitative benefits as follows: [9]

> *Rehabilitation benefits.* Would require coverage for rehabilitation procedures or treatment and training which meets the

standards noted in the text. Rehabilitation benefits would be provided up to $25,000 within a five year time period.

Committee on Automobile Insurance, Colorado Legislative Council Report to the Forty–Ninth Colorado General Assembly, Res. Pub. No. 190, 23–24 (1972).

This legislative history supports the insurers' argument that the presumption language adopted by the General Assembly in 1973 was intended to create a monetary limitation on the then new requirement that some level of rehabilitation benefits must be included in insurance policies. Although the statutory language describing the provision for rehabilitation benefits differs from the language describing the provision for medical expenses, the sponsor of the bill considered the presumptive language to constitute a cap of $25,000 on the former. The contrary construction urged by Colby and Thompson renders the $25,000/five year language meaningless.

Finally, the construction of section 10–4–706(1)(c)(II) suggested by Colby and Thompson would place the section in conflict with the provisions of section 10–4–710(2)(b). Section 10–4–710(2)(b), applicable to insurance policies providing more extensive coverage than the required minimum benefits, permits an insurer to offer a policy that provides unlimited coverages but caps the total amount of benefits at $200,000. Relevant legislative history indicates that from the initial adoption of this provision in 1973, when the amount in question was $100,000, section 10–4–710(2)(b) was designed to protect insurers wary of unlimited exposure. *See Hearings on H.B. 1027 Before the House Committee on Business Affairs & Labor,* 49th Gen. Assembly, 1st Session (audio tape B, Jan. 26, 1973).

While we have not previously addressed this issue directly, in resolving related issues

procedure if rehabilitation expense exceeds $1,000], New Jersey [included within medical expense, subject to a $15,000 cap], and New York [included within basic economic loss, subject to a $50,000 cap] ).

9. The presumption language at issue here appeared in both the 1972 and 1973 drafts submitted to the legislature.

we have suggested that the rehabilitation benefit in section 10–4–706 is limited as to time and amount. *See Sulzer v. Mid–Century Ins. Co.,* 794 P.2d 1006, 1009 (Colo.1990) ("This benefit is available for a period of five years after the accident and is limited to a total of $50,000."); *Krieg v. Prudential Property & Casualty Ins. Co.,* 686 P.2d 1331, 1333 (Colo.1984) ("minimum PIP benefits ... [include] compensation up to $25,000 for rehabilitative care and treatment rendered within five years after the accident"); *Cingoranelli v. St. Paul Fire & Marine Ins. Co.,* 658 P.2d 863, 867 n. 5 (Colo.1983) ("up to $25,000 in rehabilitation benefits payable over a period of five years after the accident"). In view of the legislative history of the Act, the various purposes thereof, and the provisions of related sections of the Act, we conclude that section 10–4–706(1)(c), 4A C.R.S. (1987), was intended to require insurers to provide rehabilitation benefits coverage in a maximum amount of $50,000.

## IV

For the foregoing reasons, we affirm the judgment of the court of appeals in *Colby* and reverse the judgments of the trial court in *Thompson.* Each case is remanded to the appropriate trial court for further proceedings consistent with this opinion.

SCOTT, J., dissents, and LOHR and HOBBS, JJ., join in the dissent.

Justice SCOTT, dissenting:

Relying upon legislative history to overcome statutory language, the majority holds that section 10–4–706(1)(c)(II), 4A C.R.S. (1987), was intended to permit insurers to avoid liability for rehabilitation benefits in excess of $50,000. Maj. op. at 1305. Because the plain language of the statute does not limit the total amount of benefit payments for rehabilitation procedures or treatment and training, I disagree with the majority's construction of section 10–4–706(1)(c)(II). Therefore, I respectfully dissent.

## I

The facts are as set forth in the majority opinion. However, I would rely upon the plain language of the statute to determine the rehabilitation benefits provided by section 10–4–706.

## A

When construing statutory provisions, we should give effect to the General Assembly's intent. *Allstate Ins. Co. v. Smith,* 902 P.2d 1386, 1387 (Colo.1995); *PDM Molding, Inc. v. Stanberg,* 898 P.2d 542, 545 (Colo.1995). First, we must "look to the statutory language itself, giving words and phrases their commonly accepted and understood meaning." *PDM Molding, Inc.,* 898 P.2d at 545. Where the statutory language is plain and clear, we need not resort to interpretive rules of statutory construction; rather, we need only apply the statute as written. *Allstate Ins. Co.,* 902 P.2d at 1387; *see also PDM Molding, Inc.,* 898 P.2d at 545; *Martin v. Montezuma–Cortez Sch. Dist. RE–1,* 841 P.2d 237, 246 (Colo.1992). Thus, our construction of the statute is best informed by "resort to the plain language of the Act." *Allstate Ins. Co.,* 902 P.2d at 1387.

I also note that "[t]he Act should be liberally construed to further its remedial and beneficent purposes." *Id.* As set forth in the legislative declaration, the basic purpose of the Act "is to avoid inadequate compensation to victims of automobile accidents" and to "provid[e] benefits to persons ... injured in accidents." § 10–4–702, 4A C.R.S. (1994). The General Assembly's objective in adopting the no-fault act was to maximize insurance coverage for those unable to carry on their prior activities. *Allstate Ins. Co.,* 902 P.2d at 1387; *see also Meyer v. State Farm Mut. Auto. Ins. Co.,* 689 P.2d 585, 593 (Colo. 1984).

Today's result minimizes benefits to those injured and maximizes protection for the assets of the insurers at the expense of the insured. To the contrary, we have previously held that the legislative intent behind the

Act is to provide full compensation to persons injured in automobile accidents. *Allstate Ins. Co.*, 902 P.2d at 1388; *Sulzer v. Mid-Century Ins. Co.*, 794 P.2d 1006, 1008 (Colo.1990). The plain language, combined with the fundamental purposes behind the Act, dictates that the provision at issue, section 10–4–706(1)(c)(II), as it existed prior to the 1994 amendment, should not limit rehabilitation benefits to $50,000 as the majority has concluded. Rather, I would conclude that the section establishes a rebuttable presumption that an insurer has complied with the provision for rehabilitation services when payments made by the insurer reach "fifty thousand dollars within five years after an accident involving a motor vehicle."

### B

The majority does not accept as controlling the fact that there is no absolute $50,000 limit on rehabilitation benefits set forth in section 10–4–706(1)(c)(I)(A). That section of the statute clearly stated:

> (1) Subject to the limitations and exclusions authorized by this part 7, the minimum coverages required for compliance with this part 7 are as follows:

> (c)(1)(A) Compensation without regard to fault for payment of the cost of rehabilitation procedures or treatment and rehabilitative occupational training necessary because of bodily injury arising out of the use or operation of a motor vehicle.

§ 10–4–706(1), 4A C.R.S. (1987). This plain language militates against the majority's conclusion that an insurer's obligation to compensate persons injured in accidents for rehabilitation services and treatment is wholly met once the value of rehabilitation services has reached $50,000. What makes the majority's failure to acknowledge the absence of such an absolute limit in its holding, in my view, inappropriate and, at best, questionable, is that elsewhere in the Act, the General Assembly had no difficulty setting such an absolute limit in clear, unmistakable language.

Section 10–4–706, 4A C.R.S. (1987), set forth the minimum coverages for insurers required for compliance with the statute. Directly preceding the section on rehabilitation benefits, the statute provides for medical expenses compensation. In pertinent part, section 10–4–706(1)(b) stated:

> Compensation without regard to fault, *up to a limit of fifty thousand dollars* per person for any one accident, for payment of all reasonable and necessary expenses for medical, chiropractic, optometric, podiatric, hospital, nursing, X-ray, dental, surgical, ambulance, and prosthetic services ... performed within five years after the accident for bodily injury arising out of the use or operation of a motor vehicle.

§ 10–4–706(1)(b), 4A C.R.S. (1987) (emphasis added). Thus, the General Assembly clearly established a monetary cap on insurers' liability for medical expenses under the Act. Yet, the General Assembly did not enact a similar limit on rehabilitation benefits. If the General Assembly sought the same absolute limitation for rehabilitation expenses as medical expenses, it would have used the same language. *See People v. Guenther*, 740 P.2d 971, 976 (Colo.1987) ("It must be presumed that the legislature has knowledge of the legal import of the words it uses...."). The plain language of section 10–4–706(1)(c)(I)(A) does not conclusively establish a $50,000 limit as the minimum required coverage that insurers must provide for rehabilitation benefits.

Rather than creating an express limitation like that placed on medical benefits, the General Assembly created a presumption of compliance whereby an insurer "shall be *presumed* to have complied with the provision for rehabilitation" when payments reach $50,000 within five years after a motor vehicle accident. § 10–4–706(1)(c)(II), 4A C.R.S. (1987) (emphasis added). Because we must interpret statutes according to the plain language provided by the General Assembly, we cannot enforce a monetary limit on rehabilitation expenses similar to that limiting medical expenses where there is no such limit present in the statute.

Another portion of the statute also persuades me that there is no limit on rehabilita-

tion benefits based on a plain reading of the statute. Section 10–4–710(2)(b) stated that "[a] complying policy *may* provide that all benefits set forth in section 10–4–706(1)(b) to (1)(e) and in this section are subject to an aggregate limit of two hundred thousand dollars...." (Emphasis added.) For this phrase to have meaning, rehabilitation benefits must, in certain circumstances, permissibly exceed $50,000. If rehabilitation benefits are limited to $50,000, section 10–4–706(1)(b) to (1)(e), 4A C.R.S. (1987 & 1992 Supp.), provides the following coverage: $50,000·for medical expenses; $50,000 for rehabilitation expenses; $20,800 for lost wages; and $9,125 for essential services for a total aggregate minimum basic coverage of $129,925. However, section 10–4–710(2)(b) permits an insurer to limit "*all* benefits set forth in section 10–4–706(1)(b) to (1)(e) ... to an aggregate limit" of $200,000. If the General Assembly had intended unequivocally to limit rehabilitation benefits to $50,000, then it would not have been necessary to include a potential $200,000 "aggregate limit" of section 10–4–706 basic coverage in section 10–4–710(2)(b) if already limited to $129,925.

Also, section 10–4–710 does not otherwise refer to rehabilitation benefits. Although under section 10–4–710 an insurer is required to offer unlimited medical and income coverage, it has no duty to offer optional, extra rehabilitation benefits. Under section 10–4–710, an insurer need not offer additional rehabilitation coverage because section 10–4–706(1)(c)(II) already provides for the possibility of rehabilitation benefits exceeding $50,000.

## II

### A

The majority construes section 10–4–706(1)(c)(II) as a required minimum coverage for rehabilitation benefits. In pertinent part, section 10–4–706(1)(c)(II) stated, "[a]n insurer ... shall be presumed to have complied with the provision for rehabilitation when the value of rehabilitation services or treatment provided ... shall have reached fifty thousand dollars within five years after an accident involving a motor vehicle." § 10–4–706(1)(c)(II), 4A C.R.S. (1987). The majority confuses the meaning of this presumption of compliance by reading section 10–4–710, 4A C.R.S. (1992 Supp.), a succeeding provision of the statute which provides for optional additional coverage, as providing grounds for rebutting the presumption. Maj. op. at 1303. Specifically, the majority asserts that construing the word "presume" as establishing a monetary cap "comports with the provisions of section 10–4–710 that contemplate a scenario in which more extensive coverage may be offered and purchased." *Id.* There is, however, no statutory or historical authority for such a construction of the statute.

Furthermore, by its commonly accepted legal meaning, the word "presume" implies that the decision is not final and a person in disagreement may make a valid argument against recognition of the presumed fact. In my view, if the General Assembly intended to set a monetary cap, it would have used the proper language to establish such a maximum. Instead, the General Assembly decided to use the word "presume" which implies that a person challenging the insurer's compliance may rebut the presumption that the insurer has complied with the statutory requirements by providing fifty thousand dollars in rehabilitation benefits. To presume means, *inter alia*, "to suppose to be true without proof." Webster's Ninth New Collegiate Dictionary 932 (1985). Thus, there may be proof which will establish that the presumption is false and not to be followed. The majority assumes that the only type of proof permitted to rebut the presumption of compliance is proof that the insured purchased extended coverage from the insurer. Neither the statute nor the legislative history of the statute limits the scope of rebutting the presumption of compliance. In fact, there may be other justifiable rebuttals such as the argument that the insurer did not comply because rehabilitation benefits reasonably exceeded fifty thousand dollars and the contract between the insurer and the

insured did not limit such benefits to that amount.[1]

## B

The majority resorts to Webster's Dictionary rather than our extensive precedent concerning rebuttable presumptions. I believe our judgment to be sound when our inquiry is informed by Colorado law. I conclude that resort to our rules and law requires a result different than that found in Webster's Dictionary and what the majority proposes. For example, Colorado rule of evidence 301 provides:

In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes upon the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

CRE 301. In *Ward v. Teller Reservoir & Irrigation Co.*, 60 Colo. 47, 55, 153 P. 219, 222 (1915), we stated:

We are not to be understood as saying that such prima facie case is conclusive, for it is always subject to be overcome by evidence to the contrary....

It is in law a presumption, and "presumptions" are rules of convenience based upon experience or public policy, and established to facilitate the ascertainment of truth in the trial of causes. Except in the few instances of conclusive presumptions, one is not as a matter of law stronger or weaker than another. The whole case is then thrown open to be decided as a fact upon all the evidence. It is for the sound judgment of the jury to weigh all the circumstances, including the characters of the persons involved and the probability of different lines of conduct, and determine where the truth lies as a matter of common sense unfettered by any arbitrary rule.

*See also* § 5–1–301(15), 2 C.R.S. (1992) ("'Presumed' or 'presumption' means that the trier of fact must find the existence of the fact presumed unless and until the evidence is introduced which would support a finding of its nonexistence."); *Murray v. Montgomery Ward Life Ins. Co.*, 196 Colo. 225, 229, 584 P.2d 78, 81 (1978) ("The effect of a presumption is to create a prima facie case, upon which judgment may be rendered in the absence of contrary evidence."); *American Ins. Co. v. Naylor*, 101 Colo. 34, 37, 70 P.2d 349, 351 (1937) (same).

If the General Assembly intended the presumption in section 10–4–706(1)(c)(II) to be irrebuttable, it would have used different language. When creating conclusive presumptions, the General Assembly plainly states its intention. *See, e.g.,* § 8–41–206, 3B C.R.S. (1996 Supp.) ("Any disability beginning more than five years after the date of injury shall be conclusively presumed not to be due to the injury...."); § 7–55–113, 3A C.R.S. (1986) ("Every domestic corporation or association ... and every agricultural or livestock association ... shall be conclusively presumed to have accepted and adopted the provisions of this article...."); § 7–56–120(3), 3A C.R.S. (1986) ("In any action upon such marketing agreement, it shall be conclusively presumed that a landowner or landlord or lessor is able to control the delivery of products produced on his [or her] land by tenants...."). Therefore, I would conclude that, by using the term "presumed" versus "conclusively presumed," the General Assembly established a rebuttable presumption in

---

**1.** In these two cases, the insurance policy did limit liability for rehabilitation expenses to $50,000. Although the terms and conditions of the insurance contract between the insured and the insurer usually govern the determination of their rights and duties, *Lopez v. Dairyland Ins. Co.*, 890 P.2d 192, 194 (Colo.App.1994), the policy's provisions are not in all instances the final authority in such a determination. The No–Fault Act is incorporated as part of every auto insurance policy, and the provisions of the act govern in any conflict between the act and the policy. *Allstate Ins. Co. v. Allen*, 797 P.2d 46, 49 (Colo. 1990) (quoting *Marquez v. Prudential Property & Casualty Ins. Co.*, 620 P.2d 29, 33 (Colo.1980)).

section 10–4–706(1)(c)(I) regarding rehabilitation procedures or treatment and training.

## III

The General Assembly enacted a statutory scheme unique to Colorado. In my view, Colorado's unique provisions militate against authoritative comparison to other jurisdictions where sufficient differences exist; therefore, such comparisons are, in fact, profitless. The majority may feel compelled to make our law, with its language differences, similar in judicial gloss to other no-fault statutes. Maj. op. at 1303–04. However, our duty in construing a statute requires that we first turn to the language of the Colorado statute. This is what our General Assembly has directed by virtue of its codification of our canons of statutory construction. § 2–4–203(1), 1B C.R.S. (1980).

Although we may consult the statements of legislators who promulgated section 10–4–706(1)(c)(II), our primary goal is to construe the statute as it is written. The plain language of the statute does not require us to prohibit recovery beyond fifty thousand dollars. Furthermore, the language of the statute is not ambiguous such that we must consult the legislative history to determine its true meaning. Indeed, we should not construe a statute contrary to its clear terms.

The majority rests on the principle that we can divine the legislative intent of the General Assembly based upon the statements of a single member.[2] However, I believe it unsound, in the face of plain language, to uphold a result supported only by the contrary comments of a single member of the General Assembly.

## IV

Finally, I would not affirm the court of appeals' decision in *Colby*, as the majority does, because there exists a significant flaw in the court of appeals' analysis. In reversing the trial court in *Colby*, the court of

appeals concluded that the presumption applied to the number of years only, rather than the dollar amount or both. *Colby*, 908 P.2d at 1173. I would reach the same conclusion as the trial court did because the statutory language, on its face, created a presumption of compliance "when the value of rehabilitation services or treatment ... shall have reached fifty thousand dollars within five years after an accident involving another motor vehicle." § 10–4–706(1)(c)(II). The language of the statute clearly states that if an insurer pays $50,000 *and* the payments are made within five years after a motor vehicle accident, the insurer is entitled to the presumption of compliance. Otherwise, if the presumption were to apply only to the number of years, an insurer could postpone *any* payment for five years and still receive the presumption of compliance. If that were true, there would be no reason to include a dollar amount, making the $50,000 amount superfluous. Thus, I would conclude that the presumption of compliance is triggered only when both the dollar and time limitations are met.

Accordingly, because I would rely upon the plain language of the statute without resort to legislative history, I respectfully dissent.

I am authorized to say that Justice LOHR and Justice HOBBS join in this dissent.

---

**2.** In fact, the majority relies on legislative history supporting a proposed $25,000 limit on rehabilitation expenses, yet that is not the language we are construing here today. Indeed, there is no

discussion of a $50,000 limit in any of the statute's legislative history prior to the 1994 amendment.